## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CONSERVATION LAW FOUNDATION<br>62 Summer Street<br>Boston, Massachusetts 02110<br><br>NATURAL RESOURCES DEFENSE<br>COUNCIL, INC.<br>40 West 20th Street, 11th Floor<br>New York, New York 10011<br><br>R. ZACK KLYVER<br>1 West Street<br>Bar Harbor, Maine 04609<br><br>CENTER FOR BIOLOGICAL DIVERSITY<br>378 N. Main Avenue<br>Tucson, Arizona 85701<br><br>       *Plaintiffs*,<br><br>   v.<br><br>DONALD J. TRUMP, in his official capacity as<br>President of the United States<br>1600 Pennsylvania Avenue, NW<br>Washington, DC 20006<br><br>DAVID BERNHARDT, in his official capacity as<br>Secretary of the Department of the Interior<br>1849 C Street, NW<br>Washington, DC 20240<br><br>WILBUR ROSS, in his official capacity as<br>Secretary of Department of Commerce<br>1401 Constitution Avenue, NW<br>Washington, DC 20230 | Case No. 20-cv-1589 |

DR. NEIL JACOBS, in his official capacity as the person exercising the authority of the Administrator of the National Oceanic and Atmospheric Administration
1401 Constitution Avenue NW, Room 5128
Washington, DC 20230

       *Defendants.*

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

### INTRODUCTION

1.     This case challenges President Donald J. Trump's unlawful proclamation of June 5, 2020, which purported to revoke core protections for the Northeast Canyons and Seamounts Marine National Monument ("the Monument" or "Northeast Canyons and Seamounts") and to open the Monument to commercial fishing.

2.     The Monument—which lies in the U.S. Atlantic Ocean, approximately 130 miles off the coast of Cape Cod, Massachusetts—was designated as a national monument in 2016 by President Barack Obama pursuant to the Antiquities Act of 1906, 54 U.S.C. § 320301. *See* Presidential Proclamation No. 9496, 81 Fed. Reg. 65,161 (Sept. 15, 2016) ("the 2016 Proclamation").

3.     The 2016 Proclamation reserved and protected a unique and fragile area that features underwater canyons that rival the depth of the Grand Canyon and undersea mountains that rise higher than any mountain east of the Rockies. These dramatic geologic features support abundant and diverse ecosystems and ecological resources of great scientific interest.

4.      The Monument area provides habitat to numerous species, including endangered whales and sea turtles; sea birds, marine mammals, and fish species; and fragile deep-sea corals, some of which have been found nowhere else on earth.

5.      To protect these resources, the 2016 Proclamation prohibited commercial extractive activities—including commercial fishing—within the Monument.

6.      The prohibition on commercial fishing provided protection to the objects of scientific interest within the Monument—a rich web of ocean ecosystems and marine life that the 2016 Proclamation recognized are extremely sensitive to disturbance from extractive activities. Prohibiting commercial fishing also made the Monument a crucial reference site—unique in the U.S. Atlantic Ocean—where scientists may study marine species and ecosystems undisturbed by disruptive commercial extractive activities.

7.      In 2017, fishing industry trade groups filed a lawsuit in this Court challenging the 2016 Proclamation and seeking to reopen the Monument to commercial fishing. This Court upheld President Obama's designation of the Monument as a valid exercise of his Antiquities Act authority, and the D.C. Circuit affirmed. *Mass. Lobstermen's Ass'n v. Ross*, 349 F. Supp. 3d 48 (D.D.C. 2018), *aff'd* 945 F.3d 535 (D.C. Cir. 2019).

8.      On June 5, 2020, President Trump issued a proclamation purporting to override the 2016 Proclamation and revoke the commercial fishing prohibition within the Monument. *See* Presidential Proclamation No. 10049, 85 Fed. Reg.

35,793 (June 5, 2020) ("the Trump Proclamation"). The Trump Proclamation immediately opened the Monument to commercial fishing activities.

9. The commercial fishing activities permitted by the Trump Proclamation are incompatible with the proper care and management of the objects of scientific or historic interest identified in the 2016 Proclamation and protected by the Monument's reservation. The Trump Proclamation deprives the Monument's scientific objects of the protections they had under the 2016 Proclamation, leaving them vulnerable to the very damage that the Monument reservation was designed to avoid.

10. Although President Trump cited the Antiquities Act and the U.S. Constitution as the source of his authority, neither one authorizes the President's proclamation. The Antiquities Act empowers the President to *create* national monuments and *reserve* federally owned or controlled lands and waters to protect objects of scientific or historic interest. It does not give the President the opposite power to *revoke* those protections. Congress retained that latter power for itself. The Trump Proclamation was wholly without statutory or constitutional authority and is therefore unlawful.

11. This Court should declare the Trump Proclamation to be unlawful and enjoin Agency Defendants from implementing the Trump Proclamation and from taking actions inconsistent with the 2016 Proclamation.

## JURISDICTION AND VENUE

12.     This case arises under the Constitution and the laws of the United States. Jurisdiction is therefore proper pursuant to 28 U.S.C. § 1331.

13.     The Court has authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201-2202 and its inherent authority to issue equitable relief. Injunctive relief is also authorized by 5 U.S.C. § 706.

14.     The Court has authority to award costs and attorneys' fees under 28 U.S.C. § 2412.

15.     Venue is proper in this court pursuant to 28 U.S.C. § 1391(e)(1)(A)-(B) because Defendants reside in this judicial district, and because a substantial part of the events giving rise to the action challenged here took place in this judicial district.

## PLAINTIFFS

16.     Plaintiff CONSERVATION LAW FOUNDATION (CLF) is a non-profit membership organization dedicated, *inter alia*, to protecting marine wildlife and their habitats as well as other coastal and ocean resources in New England.

17.     To further these goals, CLF undertakes litigation and other legal advocacy on behalf of its members' interests; educates its members on conservation issues and on threats, challenges, and solutions for New England's oceans so that they can exercise their rights and protect their interests in those resources; promotes public awareness, education, and citizen involvement in the conservation

of marine wildlife and resources; and supports programs for the conservation of marine wildlife and their habitats.

18.     On behalf of its members, CLF has worked intensively in the Atlantic Ocean in the vicinity of the Monument to prevent and combat damage from extractive activities (including harmful commercial fishing practices) for more than 30 years, and it advocated extensively on behalf of its members for the creation of the Monument.

19.     Plaintiff NATURAL RESOURCES DEFENSE COUNCIL, INC. (NRDC), is a non-profit environmental membership organization with hundreds of thousands of members nationwide, including tens of thousands of members in states along the northeastern Atlantic seaboard. NRDC's mission is to safeguard the earth—its people, its plants and animals, and the natural systems on which all life depends.

20.     NRDC has a longstanding commitment to the protection of vulnerable marine ecosystems. For more than three decades, NRDC has advocated for the protection and long-term sustainability of ocean resources on behalf of its members. A central part of NRDC's mission is to protect the nation's seas from harmful exploitation and to conserve the oceans' living resources.

21.     NRDC has long worked to prevent and combat damage from extractive activities, including harmful commercial fishing practices, in and around the Monument and elsewhere in the Atlantic Ocean, and it advocated for the creation of the Monument on behalf of its members.

6

22.     Plaintiff R. ZACK KLYVER was the Lead Naturalist for Bar Harbor Whale Watch Company, located in Bar Harbor, Maine, for 30 years. Since April 2019 he has continued to work as a naturalist for Bar Harbor Whale Watch Company on a part-time basis, continuing to lead trips to observe whales and other marine life several times per week throughout the summer and fall tourist seasons.

23.     In 2019 he co-founded Blue Planet Strategies, LLC, a consulting firm that uses science and law to helps its clients solve ocean conservation problems around the world. Mr. Klyver also owns his own international ecotourism company called Flukes, Inc., that specializes in taking clients to see whales around the world. He is also a member of the Atlantic herring advisory panel for the New England Fishery Management Council.

24.     Mr. Klyver has guided over 3,000 trips and taken over 600,000 passengers to see and learn about the whales, seabirds, and other marine wildlife of the northwest Atlantic Ocean. The Monument's protections benefitted Mr. Klyver by reducing harms to, and facilitating scientific research about, species and ecosystems in these areas. He is currently working with a team planning research trips to the Monument, and his ecotourism company Flukes, Inc. is planning a 2021 tour to the Monument. Mr. Klyver actively supported the creation of the Monument, including by speaking at a public hearing in Providence, Rhode Island, in September 2015, as well as at other public educational events.

25.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY is a non-profit environmental organization whose primary mission is to ensure the long-term

health and viability of animal and plant communities around the world and to protect both the natural world and humans from environmental harms.

26.     Center for Biological Diversity has devoted considerable resources to ensuring the conservation and sound management of numerous marine species threatened by destructive activities in our oceans, including unsustainable fishing practices.

27.     Plaintiffs and their members benefited from the 2016 Proclamation's prohibition on commercial fishing. Thus, as described in greater detail below, they would benefit from an order declaring the Trump Proclamation unlawful and enjoining the Agency Defendants from implementing it.

## DEFENDANTS

28.     Defendant DONALD J. TRUMP is sued in his official capacity as President of the United States.

29.     President Trump resides and conducts his duties in Washington, D.C.

30.     Defendant DAVID BERNHARDT is sued in his official capacity as the Secretary of the Interior of the United States.

31.     Secretary Bernhardt is responsible for ensuring that the Department of the Interior and its constituent agencies, including the U.S. Fish and Wildlife Service, comply with the applicable law, including the 2016 Proclamation's directives and requirements for managing the Monument.

32.     The Secretary of the Interior resides and conducts his duties in Washington, D.C.

33.     Defendant WILBUR ROSS is sued in his official capacity as the Secretary of Commerce of the United States.

34.     Secretary Ross is responsible for ensuring that the Department of Commerce and its constituent agencies, including the National Oceanic and Atmospheric Administration (NOAA), comply with the applicable law, including the 2016 Proclamation's directives and requirements for managing the Northeast Canyons and Seamounts Marine National Monument.

35.     The Secretary of Commerce resides and conducts his duties in Washington, D.C.

36.     Defendant DR. NEIL JACOBS is sued in his official capacity as the person exercising the authority of the Administrator of NOAA within the U.S. Department of Commerce.

37.     The Administrator of NOAA (and currently, Dr. Jacobs) is responsible for ensuring that NOAA complies with the applicable law, including the 2016 Proclamation's directives and requirements for managing the Monument.

38.     The Administrator of NOAA (and currently, Dr. Jacobs) resides and conducts his duties in Washington, D.C.

39.     The above-named Defendants have the authority, ability, and obligation to remedy the harms alleged to Plaintiffs' interests.

## BACKGROUND

**The Antiquities Act**

40.     The U.S. Constitution gives Congress the exclusive "power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. art. IV, § 3, cl. 2 ("the Property Clause").

41.     In 1906, Congress delegated a part of its power to the President when it enacted the Antiquities Act. The Act authorizes the President to "declare by public proclamation historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated on land owned or controlled by the Federal Government to be national monuments," and to "reserve parcels of land as a part of the national monuments" that constitute the smallest area "compatible with the proper care and management of the objects to be protected." 54 U.S.C. § 320301(a), (b).

42.     Exercising Congress's delegation of authority in the Antiquities Act, Presidents have declared and reserved more than 150 national monuments in thirty-two states, four territories, two oceans, and the District of Columbia, providing lasting protection for our nation's cultural, natural, and historical heritage.

43.     National monuments have included important American icons like Muir Woods in California, the Statue of Liberty in New York, and the Grand Canyon in Arizona. Depending on the nature and location of the objects to be

protected, national monument designations have ranged from just a few acres to millions of acres.

44.     A President's national monument designation confers protection on the identified "objects of historic or scientific interest" and on the area reserved as part of the monument. 54 U.S.C. § 320301(a), (b). In a national monument, protection of the objects of historic or scientific interest is the paramount purpose for which the area is to be managed.

45.     When designating a national monument, the President may "reserve" federally owned or controlled lands and waters as part of the monument, 54 U.S.C. § 320301(b), and as part of that reservation may impose specific use restrictions that are necessary for the "proper care and management of the objects to be protected," *id*.

46.     For example, Presidents' monument proclamations have frequently withdrawn monuments from the operation of mineral disposition and leasing laws. Presidents have also prohibited other extractive activities in monuments that would threaten the objects of interest, such as prohibiting commercial fishing in Papahānaumokuākea Marine National Monument and Pacific Remote Islands Marine National Monument in the Pacific Ocean (the nation's two largest marine national monuments).

47.     When such use restrictions are imposed in a President's designating proclamation, they are part of the monument reservation and have the force of law.

**The Northeast Canyons and Seamounts**

48.     The Northeast Canyons and Seamounts Marine National Monument encompasses a cluster of four extinct undersea volcanoes (known as seamounts) and three large undersea canyons that cut into the continental shelf about 130 miles off the coast of Cape Cod, Massachusetts. Formed millions of years ago, the seamounts (Bear, Mytilus, Physalia, and Retriever) rise from the ocean floor higher than any mountain east of the Rockies, and the canyons (Oceanographer, Gilbert, and Lydonia) rival the Grand Canyon in depth.



*Fig. 1: Map of Northeast Canyons and Seamounts Marine National Monument*
*Credit: NOAA*

49.     The dramatic and varied terrain of these canyons and seamounts, the ocean current and upwelling patterns they generate, and the wide range of marine habitats at different depths combine to create complex three-dimensional biological hotspots that offer food, shelter, and nursery habitats to exceptionally diverse and abundant sea life.

50.     The canyons and seamounts area has attracted intense scientific interest, particularly over the last decade as underseas technologies have made more of the ocean accessible to scientific exploration. With every exploration of the Monument area, scientists make new discoveries.

51.     To date, for example, scientists have found at least 60 different species of cold-water corals living within the Monument, including some species that have been found nowhere else on earth. Corals found at these depths grow exceptionally slowly—just millimeters per year, sometimes over the course of hundreds or even thousands of years—and they host complex communities of creatures living on and around them, including many species of fish and invertebrates.



*Fig. 2: Paramuriceid seafan (octocoral) in Oceanographer Canyon*
*Credit: NOAA, Northeast U.S. Canyons Expedition 2013*



*Fig. 3: Corals on Mytilus Seamount*
*Credit: NOAA, Northeast U.S. Canyons Expedition 2013*

52.    From the ocean floor to the ocean surface, along the flanks and crowns of the seamounts, and from the continental rise to the shelf around the canyon heads, the Monument's varied terrain supports rare and unusual lifeforms and important ecological relationships. Complex interactions occur between and across the different benthic (seafloor) and pelagic (water column) environments. For example, powerful currents created by the steep walls and slopes of the canyons and seamounts lift nutrients upward towards the surface. Such nutrient upwellings fuel the growth of plankton, the base of the food chain, which attracts schools of small fish and the larger animals that, in turn, prey on them.

53.    These biological and oceanographic dynamics make the canyons and seamounts area an important feeding ground for numerous species, including seabirds such as puffins, gulls, shearwaters, storm petrels, gannets, skuas, and terns; large predatory fish such as tuna and sharks; and multiple species of whales, dolphins, and sea turtles, some of which are endangered (such as sperm, sei, and fin whales, and leatherback sea turtles).

54.     For example, the canyons and seamounts area is the critical winter feeding ground for Maine's breeding population of Atlantic puffins, a population that nearly went extinct in the 1970s. Using geolocation devices, scientists recently discovered that the birds spend several months each winter at sea, in and around the Monument.



*Fig. 4: Atlantic puffin*
*Credit: Project Puffin/Stephen W. Kress*

**Threats Posed by Commercial Fishing**

55.     The Monument's ecosystems are acutely vulnerable to damage caused by commercial fishing. Commercial fishing gears historically used in this area have included bottom and midwater trawls (e.g., for mackerel, squid, and butterfish), traps and pots (e.g., for lobster and crab), and pelagic longlines (e.g., for tuna, swordfish, and billfish).



*Fig. 5: Fishing gear types, clockwise from top left: (1) bottom trawl, (2) traps and pots, (3) pelagic longline, (4) midwater trawl*
*Credit: NOAA Fisheries, "Bycatch: Fishing Gear and Risks to Protected Species," at*
*https://www.fisheries.noaa.gov/national/bycatch/fishing-gear-and-risks-protected-species*

56.     Benthic fauna—including deep-sea corals, sponges, and anemones—

create the foundation for the deep-sea ecosystem, providing food, spawning habitat,

and shelter for an array of fish and invertebrate species. Deep-sea organisms tend

to have longer lifespans and slower growth rates than their shallow-water

counterparts, making it difficult for them to recover from even single disturbances.

57.     One pass of a large weighted bottom trawl net can destroy sensitive

living habitat, such as corals, sponges and anemones. Such gear poses a particular

threat to deep-sea corals that have been growing for hundreds or even thousands of

years, and can prevent the growth of new colonies. Other fishing gear types that

contact the sea floor, such as heavy offshore lobster and crab traps and pots, are

also known to impair and destroy these habitats. Further, trawls, traps, and pots can degrade bottom sediments and important habitat structure, like cobble, and harm organisms that live in these habitats.

58. The heavy traps and pots used in offshore commercial fishing cause damage throughout the water column as well. For example, vertical lines connecting traps and pots to buoys at the surface are known to entangle whales, often fatally, as well as sea turtles such as the endangered leatherback.

59. Higher in the water column, commercial fishing removes large schools of fish and squid on which animals further up the food chain—like marine mammals, sea turtles, and sea birds—rely for survival.

60. Commercial fishing gears also inadvertently catch, injure, and kill non-targeted species—a phenomenon called "bycatch."

61. For example, pelagic longlines—which can stretch thirty miles long, with thousands of baited hooks that are intended to catch large fish like swordfish and tuna—catch other marine wildlife such as whales, dolphins, seabirds, sea turtles, and non-targeted sharks and other fish. It is not possible to eliminate this bycatch.

62. Commercial fishing gear is frequently lost or abandoned in the ocean, causing bycatch and entanglement from so-called "ghost gear."

63. Commercial fishing further results in increased vessel traffic and underwater noise, and an increased risk of ship strikes, which harm and disturb marine wildlife present in the Monument's reserved areas.

64.    The Magnuson-Stevens Fishery Conservation and Management Act

("Magnuson-Stevens Act") generally regulates commercial fishing in U.S. waters,

including the Exclusive Economic Zone, from 3 to 200 miles from the coast. Under

the Magnuson-Stevens Act, regional fishery management councils, which include

fishing industry representatives, are charged with recommending management

measures for most managed ocean fisheries.

65.    In the Monument area, council-managed fisheries include trawl

fisheries and the red crab trap fishery. NOAA Fisheries manages the Atlantic

highly migratory species fishery, which includes the longline fishery for tuna and

swordfish. 16 U.S.C. § 1852(a)(3). Under the Atlantic Coastal Fisheries Cooperative

Management Act, the Atlantic States Marine Fisheries Commission, an interstate

commission, cooperates with NOAA Fisheries in managing the lobster fishery, with

NOAA Fisheries having management authority in federal waters, such as in the

Monument.

66.    The Magnuson-Stevens Act directs regional fishery management

councils to prepare fishery management plans that achieve "optimum yield" from

each of their managed fisheries. 16 U.S.C. §§ 1851(a)(1), 1852(h)(1).

67.    All fishery management plans or plan amendments must be approved,

disapproved, or partially approved by the Secretary of Commerce. *Id*. § 1854(3). The

Secretary of Commerce issues regulations implementing the fishery management

plans or plan amendments. *Id*. § 1854(b).

68.     Under the Magnuson-Stevens Act, fishery management plans must minimize unintended bycatch of nontarget species, but only to the extent "practicable." *Id.* § 1851(a)(9). Adverse impacts to habitat from fishing gear, such as from heavy bottom trawl nets, similarly must be minimized only if "practicable," and only when the Council designates habitat as "essential" for a managed fish stock. *Id.* § 1853(a)(7).

69.     Congress has also provided councils with discretionary authority to limit damage to deep-sea corals from fishing gear. *Id.* § 1853(b)(2)(B). After considering the long-term sustainable uses of the fishery resources in an area where such corals are found, a council may prohibit or restrict fishing or fishing gears that physically damage corals.

70.     Unlike the Antiquities Act, the Magnuson-Stevens Act is not primarily a preservation statute. Its goal is not to protect ocean biodiversity, ecosystem health, or objects of historic or scientific interest, but to promote sustainable fisheries. Congress did not intend its provisions, including those relating to bycatch, habitat, and deep-sea corals, to provide the kind of permanent protection that the 2016 Proclamation provides.

71.     For example, the New England Fishery Management Council and the Mid-Atlantic Fishery Management Council have taken some limited actions in parts of the Monument area pursuant to the Magnuson-Stevens Act's essential fish habitat and deep-sea coral provisions, but they offer far less protection than the 2016 Monument reservation did. Prior to Monument's designation, the two councils

19

prohibited bottom trawls in certain deeper portions of Oceanographer and Lydonia Canyons. Since designation, the New England Council has developed an action that would prohibit bottom trawls and lobster traps in Monument areas deeper than 600 meters. Both of these actions were intended to prevent possible *future* expansion of these gears' use, but not to interfere with *existing* or recent fishing practices. Specifically, the councils' actions do not restrict bottom trawling and lobster traps in the shallower portions of the Monument, where all such fishing has historically occurred (and where known deep-sea coral habitat exists). And neither action prohibits red crab fishing (which uses heavy pots and vertical lines) or pelagic longlining.

**The Monument Designation Process**

72.    Starting in 2015, certain Plaintiffs and other stakeholders called on the Obama Administration to confer full and permanent protection on the canyons and seamounts area.

73.    There was broad support for the Monument in the region, including from scientists, members of the public, coastal businesses, recreational fishermen, religious leaders, state and local political officials, the region's two leading aquaria, regional and local conservation organizations, and others.

74.    Senator Richard Blumenthal and the entire Connecticut congressional delegation submitted to the Obama Administration a formal proposal for designation of the Monument that encompassed five major canyons and the four seamounts.

75.     The Obama Administration considered whether to designate the Monument in an extensive public process that included a public meeting in September 2015, several rounds of regional stakeholder meetings, including with commercial fishing interests and Plaintiffs, and a public comment period that was open for more than a year.

76.     More than 300,000 members of the public, including several Plaintiffs, sent letters, comments, and petitions to the Obama Administration in support of a monument.

77.     Plaintiffs and other commenters informed the Administration of the threats that commercial fishing posed to the area's natural resources, and requested that the Administration protect those resources by designating a monument prohibiting commercial fishing and other harmful extractive commercial uses.

**The 2016 Proclamation Designating the Monument and Specifying Protections**

78.     On September 15, 2016, President Obama issued the 2016 Proclamation establishing the Northeast Canyons and Seamounts Marine National Monument.

79.     The Monument is composed of two units covering roughly 4,900 square miles total, and it is located entirely within the U.S. Exclusive Economic Zone of the Atlantic Ocean. It is the only marine national monument in the U.S. Atlantic Ocean.

80.     The Canyons Unit covers approximately 940 square miles and includes three major underwater canyons, which are outstanding examples of these

ecologically rich ocean features. The Seamounts Unit encompasses roughly 3,900 square miles and includes four seamounts—the only seamounts found in the U.S. Atlantic.

81.     Between the Canyons Unit and the Seamounts Unit is a transit corridor for commercial fishing vessels along the continental shelf break.

82.     The 2016 Proclamation identified "the canyons and seamounts themselves, and the natural resources and ecosystems in and around them," as "objects of historic and scientific interest" to be protected under the Antiquities Act, and it reserved the Monument's submerged lands and waters "for the care and management of the objects of historic and scientific interest therein." The 2016 Proclamation provided that the Monument's boundaries were drawn to encompass the smallest area compatible with the proper care and management of the objects to be protected.

83.     The monument reservation specified in the 2016 Proclamation conferred important protections on the canyons and seamounts and the natural resources and ecosystems in and around them.

84.     The 2016 Proclamation directed the Secretary of Commerce (through NOAA) and the Secretary of the Interior (through the U.S. Fish and Wildlife Service) to share management responsibility for the Monument pursuant to their applicable legal authorities.

85.     The 2016 Proclamation ordered the Secretaries to prepare a joint management plan for the Monument within three years, but it also directly imposed certain protections that would become effective before then.

86.     The 2016 Proclamation directed that the Secretaries "shall prohibit" certain destructive activities and uses in the Monument—including oil and gas leasing and "[f]ishing commercially"—to ensure the proper care and management of the Monument's objects of interest.

87.     The Monument thus became the only part of the U.S. Atlantic Ocean designated for full protection from commercial fishing and other commercial extractive activities.

88.     The 2016 Proclamation's commercial fishing prohibition for most species took effect within 60 days of the 2016 Proclamation's issuance—i.e., by November 14, 2016. The Proclamation provided for a more gradual phase-in of the prohibition for existing American lobster and red crab permit-holders, specifying that "[a]fter 7 years, red crab and American lobster commercial fishing is prohibited in the monument."

89.     The 2016 Proclamation identified other, less harmful activities that the Secretaries "may permit" in the Monument—such as recreational fishing, scientific research, whale watching, and bird watching—to the extent "such activity is consistent with the care and management of the objects within the monument."

90.     On November 4, 2016, NOAA issued a bulletin stating that commercial fishing was prohibited within the Monument as of November 14, 2016 (with the

exception of the phased-in prohibition on lobster and crab fishing). NOAA further directed that all fishing gear, aside from tagged fixed-gear lobster and crab traps and pots, must be removed from the area. Consistent with the 2016 Proclamation, NOAA also directed that recreational fishing could continue in the Monument, pursuant to permits and limits that existed before the Monument designation and any applicable future management measures.

91.     The 2016 Proclamation's commercial fishing prohibition was essential to the proper care and management of the objects the Monument was designated to protect, which specifically included the marine ecosystems encompassed by the Monument boundaries and the species that are part of those ecosystems.

92.     By prohibiting commercial fishing, the 2016 Proclamation protected the Monument's ecosystems and species from the harms described above, including the destruction and adverse modification of habitat; the bycatch of non-target species (including seabirds, turtles, whales, and dolphins); entanglement of marine mammals and other species; disturbance of fish foraging, breeding, nursery, and other essential activities; the removal of fish prey; and the reduction of the suitability of the Monument to serve as an ecological scientific reference site.

93.     The 2016 Proclamation's commercial fishing prohibition made the Monument a spawning and nursery refuge that, over time, would support higher densities of a range of fish and invertebrate species and would allow scientists to better understand the relationships between fish productivity and fishery disturbances. Studies have found that total biomass of marine life in marine

24

protected areas can be significantly greater on average than in fished areas, and a growing body of empirical evidence suggests that some of this increased biomass can have spillover benefits to adjacent areas as well.

94. The 2016 Proclamation also made the Monument an exceedingly rare, if not unique, area in the Atlantic Ocean where marine mammals and other animals can forage, congregate, raise young, and engage in other essential behaviors free of disturbance and risk of harm from commercial fishing.

95. As the effects of climate change cause increasing stress to marine wildlife, the commercial fishing prohibition would help support healthy and resilient fish, marine mammal, sea turtle, and seabird populations inside the Monument and in nearby areas of the northwest Atlantic Ocean.

96. The commercial fishing prohibition was also essential to facilitate scientific study of a largely intact ocean habitat area with minimum human disturbances. The prohibition allowed the Monument to serve as a valuable scientific reference site and control area for studying the ecology of offshore areas, and for studying regional changes to marine wildlife and ecological productivity associated with climate change.

97. Since the Monument's designation in 2016, scientific research has flourished.

98. To date, since November 2017, researchers from the New England Aquarium have conducted eight aerial scientific surveys of the Monument. During these surveys, researchers have observed and documented an extraordinary amount

of marine life inside the Monument, including sharks, rays, four species of dolphins, three species of beaked whales, pilot whales, humpback whales, fin whales, sperm whales, and a sei whale. Particularly noteworthy observations have included the rarely sighted True's beaked whale, two blue whales (the largest animal species on earth and rarely spotted in the region), and a high percentage of dolphin and whale mothers accompanied by calves and juveniles.



*Fig. 6: Fin whale swimming inside the Monument*
*Credit: New England Aquarium, November 12, 2017*



*Fig. 7: Sperm whale swimming inside the Monument*
*Credit: New England Aquarium, October 25, 2019*



*Fig. 8: Blue whale swimming inside the Monument*
*Credit: New England Aquarium, February 9, 2020*

99.    Since the Monument's designation, researchers at the Woods Hole Oceanographic Institution have explored the Monument below the water's surface using submersible technology. During a September 2018 submersible expedition to the Monument, Woods Hole scientists discovered two previously unknown species of deep-sea corals in Lydonia Canyon. The new species are types of "bubblegum corals," so called because they have soft bundles of polyps that resemble wads of bubblegum along their branches.

100.    In September 2019, NOAA conducted a scientific expedition within the Monument with NOAA Ship *Okeanos Explorer*. NOAA used a remotely operated submersible vehicle to research areas of Oceanographer Canyon, Bear Seamount, and Retriever Seamount that had not been previously surveyed or explored. NOAA also conducted a midwater dive just north of Bear Seamount.

101.    During NOAA's expedition—which was broadcast to the public via live video feed—scientists observed stunning arrays of deep-sea corals (including whip-like bamboo coral, bushy bamboo, black coral, plexaurid coral, bottlebrush golden coral, pink coral, large fans of bubblegum coral, soft coral, and stoloniferous coral),

27

sponges (including glass sponges, vase sponges, and encrusting demosponges), and mobile organisms (such as octopus, chimera, halosaurs, cusk eels, sawtooth eels, rattail fish, bristlemouth fish, juvenile king crabs, squat lobsters, jellyfish, siphonophores, goiter blacksmelt, and a possibly new species of red cidippid ctenophore).



*Fig. 9: Pink Coral on Retriever Seamount*
*Credit: NOAA Office of Ocean Exploration and Research, September 2019*

102.   U.S. government data since 2016 demonstrates that the prohibition on commercial fishing within the Monument has not harmed overall landings and revenues in the fisheries that had previously operated in the Monument area. According to the most recent data available, overall landings in the U.S. Atlantic squid, mackerel, and butterfish fishery increased 61 percent in 2017-2018 compared to 2015-2016, while overall revenues increased 22 percent during this time. Landings and revenues in this fishery are also up for Rhode Island, where most landings in the fishery occur and which has the ports most proximate to the Monument: squid, mackerel, and butterfish landings and revenues for Rhode Island

increased 35 percent and 16 percent respectively in 2017-2018 over those in 2015-2016.

103.    Meanwhile, overall landings of the principal tuna stocks (bigeye, yellowfin, and bluefin) and swordfish in the U.S. Atlantic highly migratory species fishery did not meaningfully change in 2017-2018 compared to 2015-2016. Overall revenues from tuna and swordfish catch in the fishery also remained essentially unchanged during this time.

**This Court's Review and Affirmance of the Monument's Validity**

104.    In March 2017, five fishing industry groups filed a lawsuit in this Court challenging the 2016 Proclamation and seeking an injunction forbidding the President, Secretary of Commerce, and Secretary of the Interior from enforcing the 2016 Proclamation's commercial fishing prohibition. They claimed, *inter alia*, that the Antiquities Act did not apply in the ocean and that the Monument was too large.

105.    CLF, NRDC, Mr. Klyver, and the Center for Biological Diversity—all Plaintiffs here—moved to intervene in that litigation to help defend the Monument. On March 20, 2018, this Court granted their intervention motion.

106.    On a motion to dismiss, this Court held that President Obama's designation of the Monument was a valid exercise of his Antiquities Act authority. *Mass. Lobstermen's Ass'n v. Ross*, 349 F. Supp. 3d 48 (D.D.C. 2018). The D.C. Circuit affirmed. *Mass. Lobstermen's Ass'n v. Ross*, 945 F.3d 535 (D.C. Cir. 2019).

**President Trump's Monument Review and 2020 Revocation Proclamation**

107.    A few months after taking office, President Trump issued an executive order directing the Secretary of the Interior to review certain national monuments designated since 1996, including the Northeast Canyons and Seamounts Marine National Monument. Exec. Order 13792, 82 Fed. Reg. 20,429 (Apr. 26, 2017). The executive order asserted that national monument designations "may . . . curtail economic growth," and opined as a matter of "[p]olicy" that monument designations should "balance the protection of . . . objects against the appropriate use of Federal lands and the effects on surrounding lands and communities." The executive order directed the Secretary of the Interior to submit a report making recommendations for "Presidential actions" that would "carry out the policy" described above.

108.    Two days later, President Trump issued another executive order directing the Secretary of Commerce to review all designations and expansions of marine national monuments and national marine sanctuaries within the previous ten years, including Northeast Canyons and Seamounts. Exec. Order 13795, 82 Fed. Reg. 20,815 (Apr. 28, 2017). The executive order directed the Secretary of Commerce to "report the results of the review" within 180 days.

109.    Public comments submitted during the agencies' reviews were overwhelmingly supportive of national monuments in general, and of the Northeast Canyons and Seamounts Marine National Monument in particular.

110.    Plaintiffs were among those who submitted comments in support of Northeast Canyons and Seamounts. Plaintiffs CLF, NRDC, and Center for

Biological Diversity submitted letters to both the Secretary of the Interior and the Secretary of Commerce that, among other things, described the scientific objects of interest in the Monument and the importance of the 2016 Proclamation's commercial fishing prohibition.

111.   The New England Fishery Management Council, in contrast, submitted comments arguing that the 2016 Proclamation's "limitations on fishing activity . . . should be rescinded." The Council suggested that various commercial fishing operations—including operations that use bottom trawls, lobster traps, and red crab traps—would commence or resume in the Monument area if the Trump Administration were to revoke the Monument's prohibition on commercial fishing.

112.   In August 2017, then-Secretary of the Interior Ryan Zinke submitted a report to the President. Despite acknowledging that the public comments were "overwhelmingly in favor of maintaining existing monuments," Secretary Zinke recommended that the 2016 Proclamation creating Northeast Canyons and Seamounts be "amended" to "allow[] the regional fishery management council to make fishery-management decisions" under the Magnuson-Stevens Act—that is, to lift the prohibition on commercial fishing.

113.   Secretary Zinke's report stated that "[w]hen landscape areas are designated and reserved as part of a monument, objects and large tracts of land are overlain by a more restrictive management regime, which mandates protection of the objects identified," and opined that "[a]s a result, . . . traditional uses of the land such as . . . fishing . . . are unnecessarily restricted."

114.    Although Commerce Secretary Ross's report describing the results of the Commerce review should have been submitted to the President in October 2017, neither Secretary Ross nor any other government official has ever released a Commerce report.

115.    In December 2017, President Trump issued two proclamations that substantially reduced the sizes of the Bears Ears and Grand Staircase-Escalante National Monument reservations, and thereby revoked prohibitions on mining and oil and gas leasing in the lands excised from those monuments. Cases challenging the lawfulness of those proclamations are pending in this Court.

116.    On information and belief, Secretary Zinke and/or Secretary Ross directed agency officials to develop proposals for revoking protections from Northeast Canyons and Seamounts. According to press reports, in 2017, Interior official Randy Bowman emailed a memorandum outlining such a proposal to other Interior officials with the following caveat: "In my initial draft of this memo, which was (by direction) for revoking the designation rather than just removing the fishing restrictions, I did not even mention [economic] impacts to fishermen, as I felt they were so minor in the context of the overall New England fishing industry as to undercut the case for making changes [to the Monument]." On information and belief, neither Mr. Bowman's memorandum nor any other agency justification for revoking the Monument's protections has ever been made public.

117.    On May 29, 2020, the chairs of the New England Fishery Management Council and the Mid-Atlantic Fishery Management Council, among others, sent a

letter to Secretary Ross arguing that the "ban on commercial fishing within Marine National Monument waters is a regulatory burden on domestic fisheries," and calling for "immediate action" to reopen national monuments to commercial fishing.

118.    On June 5, 2020, President Trump issued a proclamation purporting to "amend[]" the 2016 Proclamation by revoking its prohibition against commercial fishing in the Monument.

119.    President Trump announced his decision at a small roundtable event in Maine, accompanied by Interior Secretary David Bernhardt. Several invited fishing industry representatives and Maine's former governor Paul LePage were in attendance.

120.    The President's remarks during the roundtable demonstrated a general lack of awareness about the Monument's designation under the Antiquities Act, the objects of interest designated for protection, and the scope of the 2016 Proclamation's commercial fishing prohibition (which President Trump described, incorrectly, as applying only to U.S. fishing boats and not to "other countries").

121.    Before signing the proclamation, the President told the attendees: "We're undoing his [President Obama's] executive order [*sic*]. . . . What reason did he have for closing 5,000 miles? That's a lot of miles. Five thousand square miles is a lot. He didn't have a reason, in my opinion. All right. So we're opening it up. Today, I'm signing a proclamation to reverse that injustice, to reverse that order from the previous administration, and we are reopening the Northeast Canyons and the Seamounts Marine region [*sic*] to commercial fishing."

122.   President Trump continued: "And we're doing that immediately. Are we doing that as of immediately?" Secretary Bernhardt answered: "You're—you're opening up 5,000 square miles—" President Trump interjected: "As of?" Secretary Bernhardt continued: "—with the stroke of a pen. . . . You're taking down a 'no fishing' sign and opening up fishing."

123.   By revoking the prohibition on commercial fishing, the Trump Proclamation immediately exposes the Monument to commercial fishing activities that are incompatible with the proper care and management of the objects to be protected pursuant to the 2016 Proclamation. These activities will expose the marine life and ecosystems in and around the canyons and seamounts to a substantial risk of damage or permanent degradation, and greatly diminish their value for scientific research.

124.   No other President in the Antiquities Act's 114-year history has revoked protections against commercial extractive use from an entire national monument reservation, as President Trump purported to do here. The President has no constitutional or statutory authority to dismantle a national monument reservation in this manner.

125.   The commercial fishing prohibition is fundamental to the proper care and management of the Monument objects identified in the 2016 Proclamation. The revocation of this protection, if allowed to stand, will have effectively abolished the Monument designation and rendered it a national monument in name only.

126.   President Trump's proclamation opines, "[w]ith respect to fish in particular," that "[s]ome of the examples of fish species that [the 2016 Proclamation] identifies are not of such significant scientific interest that they merit additional protection beyond that already provided by other law," citing, *inter alia*, the Magnuson-Stevens Act and the National Marine Sanctuaries Act. The Trump Proclamation does not assert that those statutes provide equivalent protection to the Monument's resources as that provided by the 2016 monument reservation.

127.   Nor does the Trump Proclamation acknowledge this Court's conclusion, affirmed by the D.C. Circuit, that the National Marine Sanctuaries Act "address[es] environmental conservation in the oceans . . . in different ways and to different ends" compared with the Antiquities Act. *Mass. Lobstermen's Ass'n*, 349 F. Supp. 3d at 59 (observing that "[t]he Antiquities Act is entirely focused on preservation," whereas the Sanctuaries Act "addresses a broader set of values, including 'recreation[]' and the 'public and private uses of the [ocean] resources'" (citations omitted)), *aff'd*, 945 F.3d at 542.

128.   The Trump Proclamation selectively mentions "fish species" and "coral species" as monument objects, but it does not explain how lifting the prohibition on commercial fishing is consistent with the proper care and management of the *ecosystems* that the 2016 Proclamation designated for protection. As this Court has previously recognized, the 2016 Proclamation not only designated individual species, but "designated the *ecosystems* surrounding the canyons and seamounts" as

objects of scientific interest. *Mass. Lobstermen's Ass'n*, 349 F. Supp. 3d at 68, *aff'd*, 945 F.3d at 544.

129.    Because of the Trump Proclamation, Defendants Secretary of the Interior, Secretary of Commerce, and NOAA Administrator (collectively, "the Agency Defendants") are no longer adhering to the 2016 Proclamation's requirement that they "shall prohibit" commercial fishing within the Monument.

130.    By its terms, President Trump's revocation went into effect immediately upon his signature, without any need for further agency action. As Secretary Bernhardt confirmed at the roundtable event on June 5, 2020, President Trump's action took effect "with the stroke of a pen."

131.    On information and belief, the Agency Defendants will not implement or comply with the 2016 Proclamation's commercial fishing prohibition unless the Court declares the Trump Proclamation unlawful and sets it aside.

**President Trump's Action Harms Plaintiffs' Interests by Revoking Protections Specified in the 2016 Proclamation**

132.    President Trump's action will harm Plaintiffs and their members by revoking a core monument protection—the prohibition on commercial fishing— which is required by the 2016 Proclamation, is part of the reservation, and is necessary for the proper care and management of the ecosystems and objects of scientific interest in the Monument.

133.    Plaintiffs and their members plan to continue to view, study, and enjoy the unique habitats, fish, marine mammals, seabirds, corals, and other marine species protected by the Monument.

134.    The 2016 Proclamation's prohibition on commercial fishing within the Monument benefitted Plaintiffs and their members by enabling them to use and enjoy the ecosystems and marine life in the Monument area—and adjacent areas that benefit from spillover effects of the Monument's protections—for scientific, educational, aesthetic, and recreational purposes without disturbance or harm from commercial fishing.

135.    Conservation Law Foundation (CLF) has thousands of members in New England coastal states. CLF's members use and enjoy fish and other marine resources off the New England coast for recreational, aesthetic, educational, and scientific purposes.

136.    CLF's members have a particular interest in landscape-scale marine protection of scientifically important places in the ocean off New England, such as the Monument, because such areas increase the ocean's resilience to the stresses and changes associated with excessive human carbon emissions and serve as scientific reference sites.

137.    CLF's members include professional scientists who have been studying the habitats within and many of the species associated with the Monument and nearby areas.

138.    One such CLF member is Peter Auster, Ph.D., a scientist who specializes in marine ecology. He is a professor at the University of Connecticut, where he has worked for over 40 years. He also serves on the Habitat Committee's

Plan Development Team and Ecosystem-Based Fisheries Management Plan
Development Team for the New England Fishery Management Council.

139.    Dr. Auster has extensively studied the canyons and seamounts area
that the Monument encompasses. Over the course of multiple research trips
spanning the last 35 years, Dr. Auster has led and participated in dives—either
inside a submersible research vehicle, or by using a remotely operated vehicle—to
all three canyons and four seamounts that are now within the Monument.

140.    Dr. Auster has used multiple submersible vehicles and other ship-
based tools to study northeast submarine canyons and seamounts, principally to
understand the interactions of species and habitats, the ecological interactions
between species, and how diversity is distributed within these precipitous and
dynamic landscapes. This work, in collaboration with many academic colleagues,
has resulted in an improved understanding of the structure, the web of interactions,
and the vulnerability of these deep-sea communities. Dr. Auster has also studied
the effects of commercial fishing practices on seafloor communities, like those in the
Monument. He has seen first-hand the destruction that bottom trawling and
offshore pot fisheries can do to such areas. Because deep-sea corals can live for
hundreds of years, grow slowly, and do not propagate easily, damage caused by
commercial fishing could take centuries to recover, if ever. Other taxonomic groups
are equally vulnerable, although the current scientific understanding of population
processes is more incomplete and will benefit from further research in the
Monument. Further, fishing can significantly affect the web of interactions between

species. Removing large numbers of fishes from the local environment, those that serve as prey for apex predators, also can have deleterious effects on Monument resources.

141.    Dr. Auster was part of the dive planning team for the 2019 NOAA Ship *Okeanos Explorer* cruise to the region in 2019, which resulted in four dives to the Monument, including one in the head of Oceanographer Canyon. The results of this dive facilitated a proposal in progress (initial deadline is now July 8, 2020) to return to the canyon heads in the Monument to compare and contrast the benthic flora and fauna there with similar communities outside the Monument. The researchers' ability to compare fished and unfished sites will be eliminated as soon as fishing resumes as a consequence of this action. Dr. Auster and several collaborators are developing proposals for additional future studies that use the Monument as an unimpacted reference site. Dr. Auster plans to visit the Monument again in late 2020 or as soon as funding for such work is available.

142.    Opening the Monument to commercial fishing will harm Dr. Auster's research by jeopardizing his and other scientists' ability to conduct longitudinal studies of how an ecosystem functions unimpacted by local disturbances caused by human uses. Opening the Monument also eliminates Dr. Auster's and other scientists' ability to compare and contrast areas closed and open to commercial fishing, such as contrasting nearby seafloor and midwater communities subject to fishing pressure with those protected inside the Monument. In addition, the value of his other research in the Monument, such as scientific studies of ecological

interactions between species and diversity distribution will be significantly reduced now that commercial fishing is permitted in the Monument.

143.    The Brookline Bird Club is also a member of CLF. The Brookline Bird Club organizes paid offshore pelagic bird-watching trips to areas inside the Monument and its vicinity to observe offshore seabirds. The 2016 Proclamation's protections heightened public interest in these trips; the Brookline Bird Club intends to continue planning and participating in observation trips to the Monument. Opening the Monument to commercial fishing will diminish interest in these trips and will harm the Brookline Bird Club's ability to observe seabirds congregating and foraging, and overwintering, with minimum human disturbances or effects on the ecosystem.

144.    The 2016 Proclamation's protections benefitted CLF's members by protecting the Monument area from the disruption and damage caused by commercial fishing, by preserving the health and beauty of the ecosystems for future study and scientific research, and by enabling CLF's members to study, view, and enjoy the Monument as the only large marine protected area off New England's shores.

145.    The Natural Resources Defense Council (NRDC) has members who are scientists, educators, recreational fishermen, and bird- and wildlife-watchers who use the area in and around the Monument for research, education, wildlife viewing, aesthetic appreciation, and recreation.

146.    One such member of NRDC is Dr. Scott D. Kraus, a marine biologist whose research encompasses the biology and conservation of marine mammals and who studies the conservation benefits of the Monument's designation on marine mammals in that area.

147.    Dr. Kraus has personally flown over the Monument area conducting aerial surveys of marine mammals, and from 2017 to 2019 he directed a research team at the New England Aquarium collecting data within the Monument boundaries.

148.    Dr. Kraus has now retired from the New England Aquarium, but he remains affiliated and continues to collaborate with Aquarium researchers. Dr. Kraus also continues to conduct and publish his own research. Among other things, Dr. Kraus is involved in efforts to collect and analyze marine mammal data from areas of the northwestern Atlantic, including the Monument, through the North Atlantic Right Whale Consortium.

149.    To inform his research, Dr. Kraus continues to rely on data and imagery gathered from the New England Aquarium's Monument overflights and other surveys. Dr. Kraus also intends to return to the Monument on a research vessel to gather data. The COVID-19 pandemic has put such research trips on hold, given the difficulty of maintaining social distance aboard a research vessel, but Dr. Kraus intends to resume planning such a trip as soon as it is safe to do so.

150.    Dr. Kraus values the Monument because it is a biological hotspot from the seafloor up to the surface—an extraordinary marine Serengeti that attracts

large numbers of whales and dolphins. The Monument's prohibition on commercial fishing would have made this the only area fully protected from commercial fishing in the U.S. Atlantic.

151.    The loss of that protection will compromise Dr. Kraus's ability to assess how the lack of commercial fishing impacts—including entanglement in longlines and trap lines, and acoustic disturbances from large vessels' engine noise and depth-sounders—may impact marine mammal distribution, abundance, and behavior in the Monument.

152.    The loss of protection from commercial fishing will also impair Dr. Kraus's ability to use the Monument area as a reference and control site to study regional changes to marine wildlife associated with climate change. The Monument's prohibition on commercial fishing would have allowed Dr. Kraus to study shifts over time in marine mammal populations, distribution, and behavior in response to ecosystem changes, without confounding effects from commercial fishing.

153.    Mr. Zack Klyver regularly uses the waters of the northwest Atlantic Ocean to view, study, and educate others about marine wildlife, including wildlife that use the Monument as habitat and feeding ground, such as humpback, sperm, fin, and sei whales, and many seabirds, including the population of Atlantic puffins that nest in the summer on islands near Bar Harbor and overwinter at sea in the Monument area.

42

154.    Mr. Klyver has frequently traveled to observe marine wildlife in many different parts of the northwest Atlantic. He has led a whale and seabird boat tour to the nearby Hudson Canyon, and his company Flukes, Inc., is planning a 2021 tour that will take guests to see whales and other marine wildlife in the Monument. He is also working with teams planning research trips to the Monument in 2020 and 2021 using remotely operated underwater vehicles equipped with video cameras to observe and study the marine animals protected there.

155.    The 2016 Proclamation's commercial fishing prohibitions benefitted Mr. Klyver's interests in viewing, studying, and educating others about these whales, marine wildlife, and seabirds by providing the species with a protected source of food, shelter, and passage for their migrations and movements, reducing the negative effects of commercial fishing, and helping to ensure that they maintain healthy populations year after year.

156.    The 2016 Proclamation's commercial fishing prohibition also facilitated scientific investigation and therefore provided Mr. Klyver with information to use when educating the public, commenting on agency decisions, and advising agency decision-makers about marine life in the northwest Atlantic Ocean, as he does frequently in his capacity as a naturalist and member of the Atlantic herring advisory panel for the New England Fishery Management Council.

157.    <u>Center for Biological Diversity</u> members and staff regularly use the northwest Atlantic Ocean, including areas within and near the Monument, to view

and study marine wildlife, including humpback, right, sperm, fin, and sei whales; loggerhead and leatherback turtles; sharks and other fish; and seabirds.

158.    One such member of Center for Biological Diversity is Carl Safina, Ph.D., a marine ecologist and writer based in Long Island, New York. He is the first Endowed Professor for Nature and Humanity at Stony Brook University, and he directs the nonprofit Safina Center. He has spent decades studying, advocating, and writing about marine ecology and the impacts of commercial fishing on marine ecosystems.

159.    Dr. Safina is also a recreational fisherman. Each season, between May and October, he typically takes several fishing trips to the edge of the continental shelf off the coast of New England. Many of the species for which he fishes (including sharks, tuna, and swordfish) are highly migratory, traveling between the Monument and nearby areas. Because commercial fishing has had a severe impact on fish populations in this area of the Atlantic Ocean, it is now much harder to catch sharks, tuna, and swordfish than it was when Dr. Safina first started recreationally fishing decades ago.

160.    On these trips to the edge of the continental shelf, Dr. Safina also enjoys seeing sea turtles, seabirds, whales, and other marine wildlife. He has incorporated these creatures and the conservation threats they face from commercial fisheries in various of his books and writings, including the books "Song for the Blue Ocean," "Eye of the Albatross," "Voyage of the Turtle," and "The View from Lazy Point."

161.   Dr. Safina intends to continue making these trips to the edge of the continental shelf in future years, including in 2020.

162.   Dr. Safina has personally witnessed startling recoveries of fish populations in areas closed to commercial fishing, and has read about the population rebounds that have been scientifically studied in many such protected places worldwide. Closing areas to commercial fishing can allow fish numbers to stabilize and rebound not only inside the protected areas themselves, but also in neighboring areas as adult fish and larvae "spill over" into those other areas.

163.   Much of Dr. Safina's writing focuses on how the oceans are changing as a result of overfishing. The revocation of the commercial fishing prohibition in the Monument will deprive Dr. Safina of the information that would have resulted from other scientists' research of the Monument area as a control area undisturbed by commercial fishing.

164.   Commercial fishing in the Monument also will likely have a negative impact on Dr. Safina's ability to catch fish as a recreational fisherman and the enjoyment he receives from his trips to the edge of the continental shelf because it will negatively affect his ability to view marine animals such as sea turtles, sea birds, and whales in this area of the ocean.

165.   President Trump's revocation of the 2016 Proclamation's commercial fishing prohibition thus harms the interests of all Plaintiffs and their members. Opening the Monument to commercial fishing will likely result in increased vessel traffic and noise; bycatch and entanglement of marine mammals and other marine

45

wildlife in fishing gear; disturbance of feeding and foraging seabirds, sea turtles, and marine mammals; damage to fragile and ecologically important deep-sea coral habitat; and deleterious alterations to the area's ecology and ecosystems, including the depletion of forage fish and the extraction of large numbers of other key fish species.

166.    Commercial fishing in the Monument will likely harm endangered, threatened, and vulnerable species like whales, sea turtles, and puffins, by disrupting the areas on which they depend for overwintering, feeding, breeding, and migration, as well as injuring and killing animals directly. These impacts will adversely affect Plaintiffs' and their members' ability to view, study, and enjoy these vulnerable species in a relatively pristine, undisturbed habitat.

167.    Commercial fishing in the Monument will also interfere with scientific investigations of the canyons and seamounts area by harming and potentially extirpating species there that have yet to be identified and investigated.

168.    Finally, commercial fishing in the Monument will make it impossible for researchers and educators (including several Plaintiffs and their members) to use the Monument as a control and reference area for longitudinal or comparative studies of the effects of human disturbances on ocean ecosystems. Scientists, including some of Plaintiffs' members, plan to use the Monument as a unique control area that would help them study the impacts of commercial fishing on similar areas in the northwest Atlantic Ocean. They also plan to use the Monument to analyze the ecological and other benefits associated with landscape-scale closed

marine areas. These scientific inquiries will no longer be possible because of President Trump's revocation of the 2016 Proclamation's commercial fishing prohibition.

169.   These harms from the Trump Proclamation are likely to occur imminently. Several commercial fishing associations have asserted that their members used to fish commercially in the Monument area, using both bottom trawling and pelagic longlining gear, and that they would do so again once the 2016 Proclamation's protections were revoked.

170.   Commercial fishing industry representatives present at the roundtable on June 5, 2020, applauded the President's decision to open the Monument to commercial fishing, and several industry representatives issued press statements praising the action.

171.   Now that President Trump has revoked the 2016 Proclamation's prohibition on commercial fishing, any commercial fishing boat with a valid license and fishery permit can fish inside the Monument; they need no additional agency approval or permits before doing so.

172.   Plaintiffs' injuries would be redressed by the relief sought here.

173.   Plaintiffs have no adequate remedy at law.

## FIRST CLAIM FOR RELIEF
### *Ultra vires* action: Antiquities Act, 54 U.S.C. § 320301
### *(All Defendants)*

174.   Plaintiffs re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Complaint.

175.   In issuing his proclamation of June 5, 2020, President Trump acted without authority under the Antiquities Act, 54 U.S.C. § 320301. Under the Act, Congress authorized the President to "designate" national monuments and to "reserve" lands and waters for the protection of objects of historic or scientific interest, but not to undo such designations or to abolish such reservations, in whole or in part.

176.   As a result, the Trump Proclamation was outside the scope of President Trump's authority and is *ultra vires* and unlawful.

## SECOND CLAIM FOR RELIEF
### Separation of powers doctrine
#### *(All Defendants)*

177.   Plaintiffs re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Complaint.

178.   The Constitution vests Congress with exclusive power over federal property and foreign and interstate commerce. U.S. Const. art. IV, § 3, cl. 2; *id.* art. I, § 8, cl. 3.

179.   The President has the authority to regulate the disposition of federal property or the conduct of foreign and interstate commerce only to the extent that Congress has delegated that authority to the President.

180.   Congress has not delegated authority to the President to revoke protections for the proper care and management of monument objects or to abolish a national monument reservation, in whole or in part. In the Antiquities Act, Congress retained that authority for itself.

181.   In issuing his proclamation of June 5, 2020, President Trump intruded on Congress's exclusive power under the Property and Commerce Clauses, in violation of the doctrine of separation of powers.

## THIRD CLAIM FOR RELIEF
### Violation of the Antiquities Act, 54 U.S.C. § 320301
### *(All Defendants)*

182.   Plaintiffs re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Complaint.

183.   The President's authority may be exercised only in a manner consistent with the terms and the purpose of the Antiquities Act, including the requirement for proper care and management of the objects of historic or scientific interest identified in the 2016 Proclamation.

184.   When President Obama issued the 2016 Proclamation designating the Monument, he described the objects of scientific or historic interest that warranted protection under the Antiquities Act. He also determined that the prohibition on commercial fishing was an essential component of such protection.

185.   President Trump's proclamation revoking the prohibition on commercial fishing deprives the Monument's objects of scientific or historic interest of the protections they had under the 2016 Proclamation, leaving them vulnerable to the very damage that the Monument reservation was designed to avoid.

186.   President Trump's action is based on considerations outside the Antiquities Act, lacks any adequate legal or factual justification, and is inconsistent

with the proper care and management of the objects to be protected in the Monument.

## FOURTH CLAIM FOR RELIEF
### Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*
### *(Defendants Bernhardt, Ross, and Jacobs)*

187.   Plaintiffs re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Complaint.

188.   The Administrative Procedure Act (APA) confers a right of action on any person adversely affected by a final agency action or a failure to act and waives the federal government's sovereign immunity. 5 U.S.C. § 702.

189.   Because President Trump had no lawful authority to revoke protections from the Monument, the Secretaries of Commerce and the Interior and their subordinate officers remain subject to the 2016 Proclamation's direction that they "shall prohibit" commercial fishing in the Monument.

190.   As directed by the Trump Proclamation, the Agency Defendants have decided no longer to enforce the 2016 Proclamation's prohibition on commercial fishing within the Monument.

191.   The Agency Defendants will not carry out their duties to prohibit commercial fishing under the 2016 Proclamation as long as the Trump Proclamation remains in effect.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs request that the Court:

1.     Declare that President Trump's proclamation of June 5, 2020, is *ultra vires* and lacks authority under the Antiquities Act;

2.     Declare that President Trump's proclamation of June 5, 2020, violates the separation-of-powers doctrine;

3.     Issue injunctive relief against the Agency Defendants directing them to carry out their mandatory duties imposed in the 2016 Proclamation and enjoining them from carrying out President Trump's proclamation of June 5, 2020;

4.     Award Plaintiffs fees and costs pursuant to 28 U.S.C. § 2412; and

5.     Grant such other relief as the Court deems just and proper.


Dated:  June 17, 2020                    Respectfully submitted,

*/s/ Katherine Desormeau*
Katherine Desormeau (D.D.C. Bar ID CA00024)
Ian Fein (D.D.C. Bar ID CA00014)
Natural Resources Defense Council
111 Sutter Street, 21st Floor
San Francisco, California 94104
(415) 875-6100
kdesormeau@nrdc.org
ifein@nrdc.org

Jacqueline M. Iwata (D.C. Bar No. 1047984)
Natural Resources Defense Council
1152 15th Street, NW
Washington, DC 20005
(202) 289-2377
jiwata@nrdc.org

*Counsel for Plaintiff Natural Resources Defense Council*

/s/Erica Fuller_____
Erica Fuller (D.D.C. Bar. ID MA001)
Peter Shelley (*pro hac vice* pending)
Conservation Law Foundation
62 Summer Street
Boston, Massachusetts 02110
(617) 850-1754
efuller@clf.org
pshelley@clf.org

*Counsel for Plaintiff Conservation Law Foundation*

/s/ Roger Fleming_____
Roger Fleming (D.D.C. Bar. ID ME001)
Blue Planet Strategies, LLC
47 Middle Street
Hallowell, Maine 04347
(978) 846-0612
rflemingme7@gmail.com

*Counsel for Plaintiffs Klyver and Center for Biological Diversity*