## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CONSERVATION LAW FOUNDATION, )
*et al*., )
)
    Plaintiffs, )
)    Case No. 1: 20-cv-01589 (JEB)
v. )
)
DONALD J. TRUMP, in his official )
capacity as President of the United States, )
*et al*., )
)
    Defendants. )

## FEDERAL DEFENDANTS' MOTION TO DISMISS

Pursuant to Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure,

the United States moves to dismiss the complaint in this action for lack of jurisdiction and for

failure to state a claim upon which relief can be granted.   As detailed in the attached

memorandum:

**(I)** <u>All Counts of the Complaint</u> should be dismissed for lack of jurisdiction under

Article III because Plaintiffs' factual allegations are insufficient to demonstrate actual, concrete,

or particularized injury stemming from the Proclamation, as opposed to speculative, potential

future injuries.

**(II)** <u>All Counts against the President</u> should be dismissed because the Complaint does

not include factual allegations sufficient to show that relief entered against the President would

redress Plaintiffs' alleged injuries or that such relief could be granted by a court in light of

separation of powers concerns.  *See Franklin v. Massachusetts*, 505 U.S. 792, 796-801, 827

(1992); *Swan v. Clinton*, 100 F.3d 973, 977 n. 1 (D.C. Cir. 1996); *see, e.g.*, *Hawaii v. Trump*,

859 F.3d 741, 788 (9th Cir. 2017) (vacating injunction as to the President because it was "not appropriate").

    **(III)**  <u>Counts I and III</u>, alleging that the Proclamation exceeded the scope of the President's authority under the Antiquities Act, otherwise violated the Act, or lacks adequate legal or factual justification, should be dismissed because the Proclamation, on its face, satisfies the requirements of the Act, which grants the President discretion to determine the protections necessary for the proper care and management of the Monument's resources. Further factual review is foreclosed, in any event, by the Complaint's lack of specific, non-conclusory factual allegations supporting Plaintiffs' claims.

    **(IV)** <u>Count II</u>, alleging that the Proclamation intrudes on Congress' exclusive power under the Property and Commerce Clauses, in violation of separation of powers, should be dismissed for failure to state a claim because this count depends upon the success of Plaintiffs' arguments that the Proclamation was *ultra vires* the President's authority under the Antiquities Act, which fail, and Plaintiffs have not made factual allegations to sustain the claims otherwise.

    **(V)** <u>Count IV against Defendants Bernhardt, Ross and Jacobs</u>, under the Administrative Procedure Act, 5 U.S.C. § 706, should be dismissed for failure to state a claim because Plaintiffs have not alleged a discrete final agency action for the court to set aside or compel. *See* 5 U.S.C. §§ 704, 706(1), (2); *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 62 (2004); *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 894 (1990).

    Respectfully submitted this 31st day of August, 2020,

                    JEAN E. WILLIAMS
                    Deputy Assistant Attorney General

 _/s/_ Lucinda J. Bach
LUCINDA J. BACH
Trial Attorney
U.S. Department of Justice,
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 7611, Ben Franklin Station
Washington, D.C. 20044-7611
Phone:  202-616-9663
Fax:  202-305-0506
Email:  Lucinda.Bach@usdoj.gov

Attorneys for Federal Defendants

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CONSERVATION LAW FOUNDATION, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:20-cv-01589 (JEB) |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, | ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF
FEDERAL DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

STATUTORY AND FACTUAL BACKGROUND ............................................... 2

    A.    The Antiquities Act ................................................................................ 2

    B.    Presidential Action under the Antiquities Act ....................................... 4

    C.    Northeast Canyons and Seamounts Marine National Monument ........... 8

    D.    Plaintiffs' Complaint ............................................................................ 14

STANDARD OF REVIEW ................................................................................. 14

ARGUMENT ...................................................................................................... 15

    I.    Plaintiffs' Failure to Demonstrate Standing Deprives this Court of
        Jurisdiction ........................................................................................... 15

        A.    Plaintiffs Have Not Demonstrated Injury in Fact ..................... 16

        B.    Plaintiffs' Claims Against the President are Not Redressable ................. 23

    II.    The Antiquities Act Grants the President Broad Discretion Which Congress
        has Not Acted to Limit ........................................................................ 24

        A.    The Text and Legislative History of the Antiquities Act Authorize
            the President to Limit Monument Protections to Those Necessary to
            Protect Covered Resources ..................................................... 24

        B.    There Is a Longstanding and Extensive History of Presidential
            Modification of Monument Boundaries, and Congressional
            Acquiescence in this Practice .................................................. 27

        C.    The Supreme Court Has Approved Management Actions Modifying
            Monument Protections ............................................................. 32

    III.    Plaintiffs' *Ultra Vires* Claims Fail as a Matter of Law ......................... 33

        A.    Judicial Review of Presidential Monument Designations Is
            Extremely Limited .................................................................. 33

        B.    The President Acted Within the Scope of His Authority in Issuing
            the Proclamation ..................................................................... 35

    IV.    Plaintiffs' Allegations that the Proclamation Violated the Constitution Fail
        to State a Claim .................................................................................... 36

V.      Plaintiffs' Allegations that the Proclamation Violates the Antiquities Act
        Fail to State a Claim.................................................................................... 38

VI.     Plaintiffs' APA Count Fails to State a Claim ...................................................... 40

        A.      Plaintiffs Fail to State a Claim under 5 U.S.C. § 706(2) .......................... 41

        B.      Plaintiffs also Fail to State a Claim for an Order Compelling Agency
                Action under 5 U.S.C. § 706(1) ............................................................... 42

CONCLUSION.............................................................................................................. 43

# TABLE OF AUTHORITIES

**Cases**

*Albertson v. FCC*,
   182 F.2d 397 (D.C. Cir. 1950) ................................................................................. 27

*Al-Bihani v. Obama*,
   619 F.3d 1 (D.C. Cir. 2010) ............................................................................... 29, 30

*Anglers Conservation Network v. Pritzker*,
   809 F.3d 664 (D.C. Cir. 2016) ................................................................................. 43

*Arpaio v. Obama*,
   797 F.3d 11 (D.C. Cir. 2015) ................................................................................... 17

*Barnett v. Obama*,
   No. SACV09-0082 DOC (ANX), 2009 WL 3861788 (C.D. Cal. Oct. 29, 2009) ................... 24

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ................................................................................................ 16

*Bennett v. Spear*,
   520 U.S. 154 (1997) ................................................................................................ 42

*Cameron v. United States*,
   252 U.S. 450 (1920) ................................................................................................ 25

*\*Cappaert v. United States*,
   426 U.S. 128 (1976) ......................................................................................... 25, 33

*Carpenters Indus. Council v. Zinke*,
   854 F.3d 1 (D.C. Cir. 2017) ..................................................................................... 16

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ................................................................................................ 17

*Cobell v. Norton*,
   240 F.3d 1081 (D.C. Cir. 2001) ............................................................................... 42

*Ctr. for Biological Diversity v. Zinke*,
   260 F. Supp. 3d 21 (D.D.C. 2017) ........................................................................... 43

*Dakota Cent. Tel. Co. v. South Dakota*,
   250 U.S. 163 (1919) ................................................................................................ 34

*Dalton v. Specter*,
   511 U.S. 462 (1994) ...................................................................... 34, 36, 38, 41

*Dames & Moore v. Regan*,
   453 U.S. 654 (1981) ..................................................................... 25, 29, 32

*Del Monte Fresh Produce v. United States*,
   570 F.3d 316 (D.C. Cir. 2009) ................................................................................. 17

*El Paso Nat. Gas Co. v. United States*,
750 F.3d 863 (D.C. Cir. 2014) ........................................................................ 43

*Electronic Privacy Information Center v. Federal Aviation Administration*,
892 F.3d 1249 (D.C. Cir. 2018) ................................................................. 17, 18

*Fludd v. Mitchell*,
181 F. Supp. 3d 132 (D.D.C. 2016) ................................................................. 16

*Franklin v. Massachusetts*,
505 U.S. 792 (1992) ..................................................................................... 1, 24

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
528 U.S. 167 (2000) ........................................................................................ 16

*Gammill v. U.S. Dep't of Educ.*,
989 F. Supp. 2d 118 (D.D.C. 2013) ........................................................... 15, 16

*Hawaii v. Trump*,
859 F.3d 741 (9th Cir. 2017) ............................................................................ 1

*King v. St. Vincent's Hosp.*,
502 U.S. 215 (1991) ........................................................................................ 28

*Kingdomware Techs., Inc. v. United States*,
136 S. Ct. 1969 (2016) .................................................................................... 26

*Kowal v. MCI Commc'ns Corp.*,
16 F.3d 1271 (D.C. Cir. 1994) ......................................................................... 16

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ................................................................................... 19, 22

*Lujan v. Nat'l Wildlife Federation*,
497 U.S. 871 (1990) ........................................................................... 2, 18, 42

*Marbury v. Madison*,
1 Cranch 137 (1803) ....................................................................................... 29

*Massachusetts Lobstermen's Association v. Ross*,
349 F. Supp. 3d 48 (D.C. 2018) ............................................... 8, 15, 16, 35, 40

*Massachusetts Lobstermen's Association v. Ross*,
945 F.3d 535 (D.C. Cir. 2019) ..................................................... 4, 35, 40

*McCulloch v. Maryland*,
4 Wheat 316 (1819) ........................................................................................ 29

*Medellin v. Texas*,
552 U.S. 491 (2008) ................................................................................... 25, 29

*Mountain States Legal Found. v. Bush*,
306 F.3d 1132 (D.C. Cir. 2002) .......................................... 25, 35, 36, 38, 41

*N.L.R.B. v. Noel Canning*,
  573 U.S. 513 (2014) ............................................................................................. 29, 32

*N.L.R.B. v. SW General, Inc.*,
  137 S. Ct. 929 (2017) ................................................................................................... 32

*Nat'l Treasury Emps. Union v. United States*,
  101 F.3d 1423 (D.C. Cir. 1996) .................................................................................... 18

*Newdow v. Bush*,
  391 F. Supp. 2d 95 (D.D.C. 2005) ................................................................................ 24

*Norton v. S. Utah Wilderness Alliance*,
  542 U.S. 55 (2004) ...................................................................................................... 2, 43

*\*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*,
  797 F.3d 1087 (D.C. Cir. 2015) ............................................................................... 17, 18

*Public Citizen v. Trump*,
  No. 17-cv-253, --- F.Supp.3d ---, 2018 WL 1129663 (D.D.C. Feb. 26, 2018) ...... 17

*Sierra Club v. Antwerp*,
  560 F. Supp. 2d 21 (D.D.C. 2008) ................................................................................ 27

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016) ................................................................................................. 16

*Stewart v. Nat'l Educ. Ass'n*,
  471 F.3d 169 (D.C. Cir. 2006) ...................................................................................... 16

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ..................................................................................................... 18

*Swan v. Clinton*,
  100 F.3d 973 .............................................................................................................. 1, 24

*Tulare Cnty. v. Bush*,
  185 F. Supp. 2d 18 (D.D.C. 2001) ........................................................................... 39, 40

*\*Tulare Cnty. v. Bush*,
  306 F.3d 1138 (D.C. Cir. 2002) .......................................................................... 35, 36, 38

*United States v. California*,
  436 U.S. 32 (1978) ....................................................................................................... 25

*United States v. George S. Bush & Co.*,
  310 U.S. 371 (1940) ........................................................................................ 34, 36, 39, 41

*United States v. Midwest Oil Co.*,
  236 U.S. 459 (1915) ..................................................................................................... 29

*United Transp. Union v. ICC*,
  891 F.2d 908 (D.C. Cir. 1989) ...................................................................................... 17

*Utah Ass'n of Ctys. v. Bush,*
   316 F. Supp. 2d 1172 (D. Utah 2004)..........................................2, 3, 4, 36, 37, 38, 44

*Whitman v. Am. Trucking Ass'ns,*
   531 U.S. 457 (2001)...........................................................................................38

*Whitmore v. Arkansas,*
   495 U.S. 149 (1990)...........................................................................................17

*Youngstown Sheet & Tube Co. v. Sawyer,*
   343 U.S. 579 (1952)....................................................................................25, 29

**Statutes**

16 U.S.C. § 1801..................................................................................................9

16 U.S.C. § 221..................................................................................................31

16 U.S.C. § 251..................................................................................................31

43 U.S.C. § 1701(a)(4).........................................................................................32

43 U.S.C. § 1714(j)..............................................................................................32

5 U.S.C. § 704.................................................................................................2, 42

5 U.S.C. § 706......................................................................................................2

**5 U.S.C. § 706(1)**.................................................................................................43

5 U.S.C. § 706(2)...........................................................................................41, 42

5 U.S.C. §§ 701-706...............................................................................................2

54 U.S.C. § 320301...............................................................................................4

54 U.S.C. § 320301(a)....................................................................................25, 27

54 U.S.C. § 320301(b)..........................................................................1, 25, 33, 34, 37

**Other Authorities**

40 Cong. Rec. 7888.............................................................................................33

85 Fed. Reg. 35,793 (June 5, 2020) ............................................................43, 48, 50

H.R. Rep. No. 59-224 (1906)......................................................................3, 4, 33, 34

Proclamation 10049, 85 Fed. Reg. 35793 (June 5, 2020) (President Trump) ... 1, 2, 12, 13, 28, 47, 48, 58

Proclamation 1167, 37 Stat. 1716 (Jul. 31, 1911) (President Roosevelt) ................6, 10

Proclamation 1186, 37 Stat. 1733 (Mar. 14, 1912) (President Taft) ............................7

Proclamation 1191, 37 Stat. 1737 (Apr. 17, 1912) (President Taft).......................8, 10

Proclamation 1293, 39 Stat. 1726 (May 11, 1915) (President Wilson)....................8, 10

Proclamation 1862, 45 Stat. 2984 (Jan. 7, 1929) (President Coolidge)....................................8, 10

Proclamation 2295, 53 Stat. 2465 (Aug. 29, 1938) (President Roosevelt)..............................8, 10

Proclamation 2393, 54 Stat. 2692 (Apr. 4, 1940) (President Roosevelt)..........................7, 10, 38

Proclamation 2454, 55 Stat. 1608 (Jan. 2, 1941) (President Roosevelt) ...............................8, 10

Proclamation 2659, 59 Stat. 877 (Aug. 13, 1945) (President Truman) ...................................7, 10

Proclamation 3089, 69 Stat. c27 (Mar. 31, 1955) (President Eisenhower) .............................7, 10

Proclamation 3132, 70 Stat. c26 (Apr. 6, 1956) (President Eisenhower)...................................10

Proclamation 3138, 70 Stat. c31 (Jun. 7, 1956) (President Eisenhower)...............................9, 10

Proclamation 3307, 73 Stat. c69 (Aug. 7, 1959) (President Eisenhower) ..................................10

Proclamation 3344, 74 Stat. 56 (Apr. 8, 1960) (President Eisenhower ................................7, 10

Proclamation 3360, 74 Stat. c79 (July 22, 1960) (President Eisenhower) .................................10

Proclamation 3539, 77 Stat. 1006 (May 27, 1963) (President Eisenhower)..........................9, 10

Proclamation 697, 34 Stat. 3266 (Dec. 8, 1906) (President Taft)...............................................6

Proclamation 881, 26 Stat. 2501 (Sept. 25, 1909) (President Taft) ..........................................9

Proclamation 9478, 81 Fed. Reg. 60227 (Aug. 26, 2016) (President Obama) .............................9

Proclamation 9496, 81 Fed. Reg. 65161 (2016) (President Obama) ..........................................11

Proclamation No. 1167, 37 Stat. 1716 (July 31, 1911)...............................................................37

Proclamation No. 1186, 37 Stat. 1733 (Mar. 14, 1912)..............................................................37

Proclamation No. 1191, 37 Stat. 1737 (Apr. 17, 1912) (President Taft) .....................................39

Proclamation No. 1293, 39 Stat. 1726 (May 11, 1915) (President Wilson) ...............................39

Proclamation No. 1862, 45 Stat. 2984 (Jan. 7, 1929) (President Coolidge)...............................39

Proclamation No. 2295, 53 Stat. 2465 (Aug. 29, 1938) ...........................................................38

Proclamation No. 2454, 55 Stat. 1608 (Jan. 2, 1941) ...............................................................38

Proclamation No. 2659, 59 Stat. 877 (Aug. 13, 1945)..............................................................38

Proclamation No. 3089, 69 Stat. c27 (Mar. 31, 1955) .............................................................38

Proclamation No. 3539, 77 Stat. 1006 (May 27, 1963) ............................................................38

Pub. L. No. 59-209, 34 Stat. 225 (1906).............................................................................3, 5

Pub. L. No. 65-277, 40 Stat. 1175 (1919)................................................................................40

Pub. L. No. 81-787, 64 Stat. 849 (1950)..................................................................................40

Pub. L. No. 92-155, 85 Stat. 422 (1971)..................................................................................39

**INTRODUCTION**

The Antiquities Act of 1906 (the "Act") authorizes the President to designate national monuments and make reservations of land "confined to the smallest area compatible with the proper care and management of the objects to be protected [therein]." 54 U.S.C. § 320301(b). On June 5, 2020, President Trump signed Proclamation 10049, modifying the Northeast Canyons and Seamounts Marine National Monument ("Monument") to permit commercial fishing based on his determination that such a ban was not necessary, at this time, for the proper care and management of the Monument's resources. *See* Proclamation 10049 of June 5, 2020, 85 Fed. Reg. 35793. Less than two weeks later, Plaintiffs—Conservation Law Foundation, Natural Resources Defense Council, R. Zack Klyver and the Center for Biological Diversity— challenged the President's action.

Plaintiffs' Complaint suffers multiple, incurable defects. First, Plaintiffs lack standing to challenge the Proclamation because they have not submitted competent evidence to support their standing. Nor can they allege facts demonstrating that they have suffered or will suffer any imminent, concrete or particularized injury traceable to the Proclamation. In any event, Plaintiffs' claims largely focus on seeking relief directly against the President, and they fail to show that such extraordinary relief is appropriate under the circumstances—or even that it would redress their alleged injuries. *See Franklin v. Massachusetts*, 505 U.S. 788, 796-801, 827 (1992).

Even ignoring these threshold defects, Plaintiffs' claims are meritless. The President lawfully exercised his authority under the Antiquities Act in lifting the prohibition on commercial fishing within the Monument, based on his finding that the restriction is no longer compatible with the management and protection of its objects of scientific interest. 85 Fed.

1

Reg. 35793 at 3.  Nothing in the Antiquities Act precludes one President's modification of another's determination on this basis, and many decades of congressional acquiescence in this practice confirms the President's authority.  Judicial review of the President's exercise of authority under the Antiquities Act is limited to determining whether, on the fact of the Proclamation, the President exceeded his authority under the Act.  As explained below, he did not.  And, absent specific, non-conclusory factual allegations demonstrating that the President acted beyond his authority, further review is foreclosed.  Here, the Complaint's conclusory allegations fail to state a claim for which relief can be granted.  Finally, Plaintiffs' claims against the Secretaries of the Interior and Commerce and Administrator of the National Oceanic and Atmospheric Administration under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, fail to identify final agency action, and fail to identify discrete actions that these officials are legally obligated to take.  *See Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55 (2004).

## STATUTORY AND FACTUAL BACKGROUND

### A.    The Antiquities Act

In 1906, Congress passed the Antiquities Act, delegating to the President power to declare landmarks, structures, and objects of historic and scientific interest to be national monuments, and to reserve federal lands for their protection.  *See* Pub. L. No. 59-209, 34 Stat. 225 (1906) (codified at 54 U.S.C. § 320301).  The legislation stemmed from proposals, primarily from archaeological organizations, to protect objects of antiquity on federal lands.  *See Utah Ass'n of Ctys. v. Bush* ("*UAC*"), 316 F. Supp. 2d 1172, 1178 (D. Utah 2004).  At the turn of the twentieth century, public lands were generally open to the public and available for homestead, mining, oil, gas, and other claims, unless Congress or the Executive Branch had "withdrawn" the land from

the public domain or "reserved" the land for a particular purpose.  As a result, many historic sites on public lands had been looted and destroyed.  *See* H.R. Rep. No. 59-224, at 3 (1906).

For several years, Congress debated proposals to provide withdrawal authority to the President or the Secretary of the Interior to protect historic and other resources.  *See UAC*, 316 F. Supp. 2d at 1178.  In particular, some members of Congress were concerned that the bill would permit large areas of land to be withdrawn from entry.  For example, Rep. John Stephens of Texas asked, "How much land will be taken off the market in the Western States by passage of the bill?"  The bill's sponsor, Rep. Lacey, responded, "Not very much.  The bill provides that it shall be the smallest area [necessary] for the care and maintenance of the objects to be preserved."  40 Cong. Rec. 7888 (1906).  The House Report on the enacted bill also noted that it was intended "to create small reservations reserving *only so much land* as may be *absolutely necessary* for the preservation of those interesting relics of prehistoric times."  H.R. Rep. No. 59-2224, at 1 (emphases added).

Congress understood that initial reservations of land might be inaccurate or uninformed. For example, the report of Professor Edgar L. Hewett, a chief architect of the Antiquities Act, was incorporated into the House Report and indicates that many withdrawals would only be temporary in nature: he explained that, while some lands "are sufficiently rich in historic and scientific interest and scenic beauty to warrant their organization into permanent national parks," "many others should be temporarily withdrawn and allowed to revert to the public domain after the ruins thereon have been examined by competent authority[.]"  H.R. Rep. No. 59-2224, at 3; *see also id*. at 7 (stating that "the permanent withdrawal of tracts of land from the public domain for the purposes of protecting ruins thereon would seem to be unnecessary except where the ruins are of such character and extent to warrant the creation of permanent national parks").

3

As enacted, the Antiquities Act authorized the President "in his discretion, to declare by public proclamation historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated upon the lands owned or controlled by the Government of the United States to be national monuments."  Pub. L. No. 59-209, § 2, 34 Stat. 225 (1906).  The statute also authorized the President to reserve only those lands necessary to protect the monument objects, stating that he "may reserve as a part thereof parcels of land, the limits of which in all cases shall be confined to the smallest area compatible with the proper care and management of the objects to be protected."  *Id.*

In 2014, the Antiquities Act was recodified, and now reads, in relevant part:

(a) Presidential declaration—The President may, in the President's discretion, declare by public proclamation historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest situated on land owned or controlled by the Federal Government to be national monuments.

(b) Reservation of land—The President may reserve parcels of land as part of the national monuments.  The limits of the parcels shall be confined to the smallest area compatible with the proper care and management of the objects to be protected.

54 U.S.C. § 320301.

**B.      Presidential Action under the Antiquities Act.**

In affirming dismissal of an action challenging the Monument's designation, the United States Court of Appeals for the District of Columbia Circuit recently observed that:  "Over the last century, Presidents have created a total of 158 national monuments, protecting a wide range of the nation's historic and scientific resources."  *Massachusetts Lobstermen's Association v. Ross,* 945 F.3d 535, 537 (D.C. Cir. 2019).  Almost as old as the history of presidential designation of monuments is the history of presidential modification of those designations.  At the time of the Antiquities Act's passage, President Theodore Roosevelt used this new authority

4

to proclaim eighteen monuments.[1]  His successor, President Taft, proclaimed ten monuments,

but also diminished two monuments established by President Roosevelt.  In 1911, he determined

that the Petrified Forest National Monument, "through a careful geological survey of its deposits

of mineralized forest remains," reserved "a much larger area of land than is necessary to protect

the objects for which the Monument was created, and therefore the same should be reduced in

area to confirm to the requirement of the act authorizing the creation of National Monuments."

Proclamation 1167, 37 Stat. 1716 (Jul. 31, 1911).  He reduced the area of the monument by more

than 40 percent.  *Compare id.* (reducing reservation to 25,626.60 acres); *with* Proclamation 697,

34 Stat. 3266 (Dec. 8, 1906) (reserving 60,776.02 acres).  President Taft also reduced the Navajo

National Monument in Arizona three years after its establishment, finding that, "after careful

examination and survey of the prehistoric cliff dwelling pueblo ruins," the original proclamation

"reserve[d] a much larger tract of land than is necessary for the protection of such ruins as should

be reserved, and therefore the same should be reduced in area to conform to the requirements of

the act authorizing the creation of National Monuments."  Proclamation 1186, 37 Stat. 1733

(Mar. 14, 1912).  He substantially reduced the monument to three separate tracts—two

containing 160 acres each, and one containing forty acres—to protect three ruins.  *Id.*

Many other Presidents have reduced monuments, finding that the removed lands "are not

necessary for the proper care and management of the objects of scientific interest situated on the

lands within the said monument."  *See, e.g.*, Proclamation 2393, 54 Stat. 2692 (Apr. 4, 1940)

(reduction of Grand Canyon National Monument by President Franklin Roosevelt); Proclamation

---

[1] *See* Nat'l Park Serv. ("NPS"), Archeology Program, Monuments List, available at:
https://www.nps.gov/archeology/sites/antiquities/monumentslist.htm ("NPS List"); NPS,
Archeology Program, Frequently Asked Questions, available at:
https://www.nps.gov/archeology/sites/antiquities/FAQs.doc ("NPS FAQS").

3344, 74 Stat. 56 (Apr. 8, 1960) (reduction of Black Canyon of the Gunnison National

Monument by President Eisenhower).

Presidents have also cited other rationales as the basis for monument reduction.  For

example, President Truman excluded lands from Santa Rosa National Monument because those

lands "are needed by the War Department for military purposes."  Proclamation 2659, 59 Stat.

877 (Aug. 13, 1945); *see also* Proc. 3089, 69 Stat. c27 (Mar. 31, 1955) (elimination by President

Eisenhower of some lands from Glacier Bay National Monument that were "being used as an

airfield for national-defense purposes and are no longer suitable for national-monument

purposes"); Proc. 2454, 55 Stat. 1608 (Jan. 2, 1941) (reduction of Wupatki National Monument

by President Franklin Roosevelt, noting that "such lands are needed in the construction and

operation of a diversion dam in Little Colorado River to facilitate the irrigation of lands on the

Navajo Indian Reservation"); Proclamation 2295, 53 Stat. 2465 (Aug. 29, 1938) (reduction by

President Franklin Roosevelt of White Sands National Monument to allow for U.S. Highway

70).  In some cases, Presidents reduced monument reservations without providing any

explanation.  For example, Mount Olympus National Monument (now Olympic National Park)

was diminished—on three separate occasions by three different Presidents—without any reason

cited in the proclamations.  *See* Proclamation 1191, 37 Stat. 1737 (Apr. 17, 1912) (President

Taft); Proc. 1293, 39 Stat. 1726 (May 11, 1915) (President Wilson); Proc. 1862, 45 Stat. 2984

(Jan. 7, 1929) (President Coolidge).[2]

---

[2] Presidents have also found that additional lands are required for the protection of the original
objects identified in a proclamation based on new or different information.  For example, in
1909, President Taft added lands to the Natural Bridges National Monument, noting that "at the
time this monument was created nothing was known of the location and character of the
prehistoric ruins in the vicinity of the bridges, nor of the location of the bridges and the
prehistoric cave springs…."  Proclamation 881, 26 Stat. 2501 (Sept. 25, 1909).  More recently,
President Obama expanded Papahānaumokuākea Marine National Monument based on his

Presidents have also eliminated and added lands within the same proclamation.  President

Kennedy modified the boundaries of Bandelier National Monument, adding lands but removing

other lands "containing limited archaeological values which have been fully researched and are

not needed to complete the interpretive story of [the] Monument."  Proclamation 3539, 77 Stat.

1006 (May 27, 1963). President Eisenhower revised the boundaries of Hovenweep National

Monument (established by President Truman) on the basis that certain lands "contain[] no

objects of historic and scientific interest" and "were erroneously included" in the Monument.

Proclamation No. 3132, 70 Stat. c26 (Apr. 6, 1956) (also adding lands containing valuable ruins

which were "erroneously omitted from the monument); *see also* Proc. No. 3138, 70 Stat. c31

(Jun. 7, 1956) (President Eisenhower, removing and adding lands to Great Sand Dunes National

Monument); Proclamation No. 3307, 73 Stat. c69 (Aug. 7, 1959) (President Eisenhower,

removing and adding lands to Colorado National Monument); Proclamation No. 3360, 74 Stat.

c79 (Jul. 22, 1960) (President Eisenhower, modifying Arches National Monument to exclude

lands "which have no known scenic or scientific value, while adding other lands found necessary

for the proper care and management of the objects on those lands and the original monument).

All told, Presidents have eliminated lands from exiting monument in at least 18 instances.[3]

---

finding that additional area was required to protect the resources identified in the original
monument.  Proclamation 9478, 81 Fed. Reg. 60227 (Aug. 26, 2016).
[3] *See* Proclamation 1167, 37 Stat. 1716 (July 31, 1911) (Petrified Forest National Monument);
Proclamation1186, 37 Stat. 1733 (March 14, 1912) (Navajo National Monument); Proclamation
1191, 37 Stat. 1737 (April 17, 1912) (Mount Olympus National Monument), Proclamation 1293,
39 Stat. 1726 (May 11, 1915) (Mount Olympus National Monument), Proclamation 1862, 45
Stat. 2984 (Jan. 7, 1929) (Mount Olympus National Monument); Proclamation 2295, 53 Stat.
2465 (Aug. 29, 1938) (White Sands National Monument); Proclamation 2393, 54 Stat. 2692
(April 4, 1950) (Grand Canyon National Monument); Proclamation 2454, 55 Stat. 1608 (Jan. 22,
1941) (Wupatki National Monument); Proclamation No. 2499, 55 Stat. 1660 (Jul. 18, 1941)
(Craters of the Moon National Monument); Proclamation 2659, 59 Stat. 877 (Aug. 13, 1945)
(Santa Rosa National Monument); Proclamation 3089, 69 Stat. c27 (March. 31, 1955) (Glacier
Bay National Monument); Proclamation 3132, 70 Stat. c26 (Apr. 6, 1956) (Hovenweep National

**C.**      **Northeast Canyons and Seamounts Marine National Monument**

In 2016, President Obama issued Proclamation 9496 (the 2016 Proclamation) which

created the Northeast Canyons and Seamounts Marine National Monument.  81 FR 65161

(2016). It protects an expanse of underwater canyons and mountains and associated ecosystems

situated about 130 miles off the eastern coast of the United States.  The Monument covers almost

5,000 square miles in the U.S. Exclusive Economic Zone ("EEZ") and includes two non-

contiguous areas which correspond to distinct geological features.  The Canyons Unit includes

three underwater canyons, and the Seamounts Unit includes four extinct undersea volcanoes.  81

FR 65161 at 1.[4]  The Proclamation identified these canyons and seamounts as objects of "intense

scientific interest" and noted that both "government and academic oceanographic institutions

have studied the canyons and seamounts using research vessels, submarines and remotely

operated underwater vehicles for important deep-sea expeditions."  *Id.* at 3.  The Proclamation

withdrew federal lands within the monument from all forms of entry, sale, or leasing and

prohibited a variety of activities:

- exploring or developing oil and gas or minerals;

- use of poisons, electrical charges or explosives in the collection of a Monument
  resource;

---

Monument); Proclamation 3138, 70 Stat. c31 (June 7, 1956) (Great Sand Dunes National
Monument); Proclamation 3307, 73 Stat. c69 (Aug. 7, 1959) (Colorado National Monument);
Proclamation 3344, 74 Stat. c56 (April 8, 1960) (Black Canyon of Gunnison National
Monument); Proclamation 3360, 74 Stat. c79 (July 22, 1960) (Arches National Monument);
Proclamation No. 3486, 76 Stat. 1495 (Aug. 14, 1962) (Natural Bridges National Monument);
Proclamation 3539, 77 Stat. 1006 (June 1, 1963) (Bandelier National Monument).
[4] President Obama's authority to designate the Monument was challenged on the grounds that:
(1) submerged lands are not "lands" within the meaning of the Antiquities Act; (2) the federal
government does not control the lands covered by the Monument; and (3) the amount of land
reserved is not the smallest compatible with its management. This Court's dismissal of the
complaint was affirmed on appeal. *Massachusetts Lobstermen's Association v. Ross,* 349 F.
Supp. 3d 48 (D.C. 2018) *aff'd* 945 F.3d 535 (D.C. Cir. 2019).

- introducing or releasing a species from within or into the Monument;

- removing, harvesting or damaging any monument resource;

- drilling into, constructing or abandoning any structure on the submerged lands, other than scientific instruments;

- commercial fishing, with the exception of red crab and lobster fisheries, which were allowed to continue until 2023.

The Proclamation expressly permits recreational fishing, research, scientific exploration and other activities that will further the educational value of the Monument or assist in its "conservation and management." *Id*. at 6-7.  Management responsibility for the Monument is shared by the Department of Commerce and the Department of the Interior.  The National Oceanic and Atmospheric Administration (NOAA") is responsible for managing activities and species, *inter alia*, under the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. § 1801 et seq. ("MSA"), the Endangered Species Act, and the Marine Mammal Protection Act.  The U.S. Fish and Wildlife Service is responsible for managing activities and species under the National Wildlife Refuge System Administration Act, the Refuge Act, and the Endangered Species Act.

On June 5, 2020, President Trump issued Proclamation 10049 (the "2020 Proclamation"), which modified the Monument's protections in one respect only:  lifting the prohibition on commercial fishing.  This modification was based on the President's finding that "appropriately managed commercial fishing would not put the objects of scientific and historic interest that the monument protects at risk."  85 FR 35793 at 2.  Commercial fishing is already subject to the federal laws set forth above, including the MSA, which regulates commercial fishing to ensure the long-term biological and economic sustainability of the United States' marine fisheries, and protection of associated marine ecosystems.

The MSA establishes regional fishery management councils that, in coordination with the states and affected stakeholders, develop fishery management plans, based on the best available science and pursuant to strict conservation and management requirements. Under Proclamation 10049, management of commercial fisheries within the marine monument reverted to the New England Fishery Management Council ("NEFMC"). The MSA establishes regional fishery management councils that, in coordination with the states and affected stakeholders, develop fishery management plans, based on the best available science and pursuant to strict conservation and management requirements. Under Proclamation 10049, management of commercial fisheries within the marine monument reverted to the New England Fishery Management Council ("NEFMC") in conjunction with the National Marine Fisheries Service ("NMFS").

The NEFMC's Omnibus Deep-Sea Coral Amendment would establish a deep-sea coral protection area that complements the Frank R. Lautenberg Deep-Sea Coral Protection Area, developed by the Mid-Atlantic Fisheries Council and implemented in 2016. The NMFS is currently undertaking rulemaking to implement the Omnibus Deep-Sea Coral Amendment. [5] The Amendment will provide sweeping protections to over 25,000 square miles of deep-sea canyons, including 82% of the Northeast Canyons and Seamounts Marine National Monument. If implemented through regulation, it would protect most coral habitats occurring in the canyons and slopes of the Monument. The protected area encompasses 75% of known and estimated coral habitats and 85% of the steep slopes, which are a strong predictor of coral occurrence. If

---

[5] NMFS published a Notice of Availability (NOA) announcing its review of the Omnibus Deep Sea Coral Amendment on August 26, 2019 (84 FR 44596). The public comment period ended on October 25, 2019. Following the Amendment's approval in November 2019, NMFS published a proposed rule for this action on January 3, 2020, including implementing regulations (85 FR 285).

finalized as proposed, the regulations would prohibit use of a wide variety of bottom-tending

commercial gear, including otter trawls, beam trawls, hydraulic dredges, non-hydraulic dredges,

bottom-tending seines, bottom longlines, pots and traps and sink or anchored gillnets, and would

exempt deep-sea red crab fishing – which has only four active vessels – but not lobster fishing.

https://www.nefmc.org/news/deep-sea-coral-amendment-to-provide-sweeping-habitat-

protection-including-in-canyons-and-seamounts-monument.

The figure below shows the areas covered by the Monument, along with the Mid-Atlantic

and New England Deep Sea Coral Protection Areas.



https://www.nefmc.org/news/deep-sea-coral-amendment-to-provide-sweeping-habitat-

protection-including-in-canyons-and-seamounts-monument.

NEFMC maps prepared before the Monument was created show limited fishing activity in the shallower canyons area of the Monument, but no fishing within the vast majority of the deeper area covered by the Monument. The figure below shows both the New England Deep Sea Coral Protection areas and multispecies fishing levels from 2011-2014:



https://www.northeastoceandata.org/case-studies/balancing-deep-sea-coral-protection-and-commercial-fisheries/.

In addition, Monkfish and Squid enclosures and Tilefish Gear restricted areas have been in place in a portion of the canyons area of the Monument for more than a decade and provide additional protections. Monkfish vessels are prohibited from fishing with any gear type while on a monkfish Day-at-Sea ("DAS") in Lyndonia and Oceanographer Canyons, and no permitted mackerel, squid, or butterfish vessel may fish in these canyons with bottom trawl gear in Lydonia, Oceanographer and Veatch Canyons. *See* Figure below.  Given all of the existing restrictions, combined with the new Deep Sea Coral Amendment, "only 10% of the Northeast Canyons and Seamounts Marine National Monument will be open to commercial fishing."

https://www.nefmc.org/news/deep-sea-coral-amendment-to-provide-sweeping-habitat-protection-including-in-canyons-and-seamounts-monument.

The figure below shows the monkfish and tilefish restricted areas within the Monument.



D.    **Plaintiffs' Complaint**.

Plaintiffs are organizations and one individual with alleged recreational, aesthetic, scientific, and cultural interests in the areas covered by the Monument.  *See* Compl. ¶¶ 132-173. Plaintiffs assert claims against the President, the Secretary of the Interior, the Secretary of Commerce and Dr. Neil Jacobs, "as the person exercising the authority of" the administrator of the National Oceanic and Atmospheric Administration ("NOAA").  Compl. ¶36.  They allege that:

(i)     the Proclamation exceeded the scope of the President's delegated authority under the Antiquities Act or otherwise violated the Act (Counts I & III);

(ii)    the Proclamation violated certain constitutional provisions and the separation of powers (Count II)); and

(iii)   the Proclamation's implementation (or the non-implementation of the prior Proclamation) is therefore unlawful and can be enjoined under the APA (Count IV).

Plaintiffs seek a declaratory judgment that the Proclamation is invalid and an injunction barring its implementation.

## STANDARD OF REVIEW

On a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), the plaintiff bears the burden of establishing that the court has jurisdiction.  *Mass. Lobstermen's Ass'n*, 349 F. Supp. 3d at 54; *Gammill v. U.S. Dep't of Educ*., 989 F. Supp. 2d 118, 120 (D.D.C. 2013).  Because the Court has "an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority," the complaint's factual allegations "will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim."

*Mass. Lobstermen's Ass'n*, 349 F. Supp. 3d at 54; *Gammill*, 989 F. Supp. 2d at 120 (same).  A court may consider materials outside the pleadings in order to resolve the question of its jurisdiction.  *Fludd v. Mitchell*, 181 F. Supp. 3d 132, 137 (D.D.C. 2016).

On a Rule 12(b)(6) motion for failure to state a claim, a court must assess whether the complaint alleges sufficient facts that, if accepted as true, state an entitlement to relief that is "plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Although the Court must accept the facts pleaded as true, legal assertions devoid of factual support are not entitled to this assumption.  *See Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).  A complaint that presents merely "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (citation omitted).  "In determining whether a complaint states a claim, the court may consider the facts alleged in the complaint, documents attached thereto or incorporated therein, and matters of which it may take judicial notice."  *Stewart v. Nat'l Educ. Ass'n*, 471 F.3d 169, 173 (D.C. Cir. 2006).

## ARGUMENT

## I.      Plaintiffs' Failure to Demonstrate Standing Deprives this Court of Jurisdiction.

Consistent with Article III's case-or-controversy requirement, a plaintiff "must demonstrate standing to sue."  *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017).  To do so, a plaintiff must show: (1) "an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2)  fairly traceable to the challenged action of the defendant; and (3) likely, as opposed to merely speculative, [to be]  . . . redressed by a favorable decision."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).  Where, as here, standing is addressed at the pleading stage, the plaintiff must "clearly . . . allege facts demonstrating" each element.  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

A.      **Plaintiffs Have Not Demonstrated Injury in Fact.**

Plaintiffs have not and cannot demonstrate a concrete and imminent injury resulting from the 2020 Proclamation because their allegations are entirely hypothetical; they depend upon future events and third party actions that may or may not occur, or may occur under conditions that would not cause actual injury to Plaintiffs.  Finally, Plaintiffs fail to demonstrate that their injuries would be redressed by a favorable decision.  As such, their claims should be dismissed.

The Complaint alleges no imminent, concrete, and particularized harm to any Plaintiff.  Rather, the allegations sketch out broad categories of potential future injuries that could or might result from commercial fishing within the Monument.  *See* Compl. ¶¶ 136-172.  But plaintiffs who rest their "claims for declaratory and injunctive relief on predicted future injury" bear "a 'more rigorous burden' to establish standing."  *Arpaio v. Obama*, 797 F.3d 11, 21 (D.C. Cir. 2015) (quoting *United Transp. Union v. ICC*, 891 F.2d 908, 913 (D.C. Cir. 1989)).  To constitute injury in fact, "'threatened injury must be *certainly impending*" and "[a]llegations of *possible* future injury are not sufficient.'"  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149 (1990).  "'Allegations of *possible* future injury' premised on 'attenuated chain[s] of inferences' will not suffice."  *Public Citizen v. Trump*, No. 17-cv-253, --- F.Supp.3d ---, 2018 WL 1129663 at * 4 (D.D.C. Feb. 26, 2018) (quoting *Clapper*, 568 U.S. at 414 n.5).  "[S]tanding is assessed as of the time a suit commences."  *Del Monte Fresh Produce v. United States*, 570 F.3d 316, 324 (D.C. Cir. 2009).

An organization can assert standing on its own behalf, on behalf of its members or both.  *Electronic Privacy Information Center ("EPIC") v. Federal Aviation Administration,* 892 F.3d 1249 (D.C. Cir. 2018); *People for the Ethical Treatment of Animals ("PETA") v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1093 (D.C. Cir. 2015).  The Plaintiff organizations – Conservation Law Foundation ("CLF"), the Natural Resources Defense Council ("NRDC"), and the Center for

16

Biological Diversity ("CBD") – appear to assert standing on behalf of their members.[6]  To establish associational standing, the organizational Plaintiffs must show that:

> (1)At least one if [its] members would have standing to sue; (2) the interests [it] seek[s] to protect are germane to the organization's purposes; and (3) neither the claim asserted nor the relief requested requires the participation of individual members.

*EPIC,* 892 F.3d at 1253.

Plaintiffs also must show that they have "suffered a concrete and particularized injury that is actual or imminent, traceable to the challenged act, and redressable by the court."  *Id.* Neither the organizational Plaintiffs, nor the individual Plaintiff, R. Zack Klyver, meet the rigorous standard required to establish standing. Their allegations of injury fall far short of establishing that any concrete and particularized injury to their interests is "certainly impending." *See Summers v. Earth Island Inst.*, 555 U.S. 488, 495 (2009); *Lujan v. Nat'l Wildlife Federation,* 497 U.S. 871, at 889 (1990).

CLF bases standing on one of its members, Peter Auster, PhD, a marine ecologist, and the Broookline Bird Club.  But it includes no allegations of concrete, particularized injuries to either member stemming from the 2020 Proclamation.  As to Dr. Auster, the Complaint alleges that, over the past 35 years, he has participated in dives either inside a research vehicle or by remotely operated vehicle to all three canyons and four seamounts within the Monument.

---

[6] To the extent the organizational Plaintiffs base standing on their own organizational interests, their claims also fail. To establish organizational standing, Plaintiffs must show that they suffered "a concrete and demonstrable injury to [their] activities, distinct from a mere setback to [the organization's] abstract social interests.  *PETA, 797 F.3d at 1093.* The organization must also show "a direct conflict between the defendant's conduct and the organization's *mission." Nat'l Treasury Emps. Union v. United States,* 101 F.3d 1423, 1430 (D.C. Cir. 1996). Impediments to issue advocacy do not establish standing. *PETA*, 797 F.3d at 1094. As explained above, the allegations in the Complaint fail to show any imminent, traceable, and redressable injury to the organizations' interests, as opposed to a mere setback in their social interests.

Compl. ¶139. However, the Complaint does not indicate whether or how those dives related to his research. It alleges only that Dr. Auster has studied the effects of commercial fishing on seafloor communities "like those in the Monument." *Id.* at ¶140. He has allegedly seen the damage that "bottom trawling and offshore pot fisheries" cause. *Id.* The Complaint further asserts that commercial fishing will immediately remove "large numbers of fishes from the local environment," which "can have deleterious effects on Monument resources." *Id.* [7] It concludes that commercial fishing will harm Dr. Auster's "research by jeopardizing" his and other scientists' ability to study how an ecosystem functions "unimpacted by local disturbances caused by human uses" and "eliminates" their ability to compare areas open and closed to commercial fishing. *Id.* ¶142.

The Complaint includes no "concrete and particularized" factual allegations showing any certainly impending injury to Dr. Auster. All of the alleged injuries are premised on the unsupportable assumption that commercial fishing will immediately blanket the entire 5,000 square mile area covered by the Monument, leaving no "unfished sites." Compl. ¶ 141. That assumption, however, is contradicted by historic data showing only moderate fishing in certain shallower areas of the Canyons unit and none within the Seamounts area. *See* pp.12-14 above. The vast majority of the Monument area was not fished before its designation, and Plaintiffs allege no facts showing that commercial fishing will deviate from historic patterns. Further, the

---

[7] Dr. Auster also references a "proposal in progress" to return to the canyon heads "to compare and contrast benthic flora and fauna there with similar communities outside the Monument." *Id.* ¶141. It does not allege that the proposal has been approved or when any such return to the Monument would take place. This is precisely the kind of "some day" intention that the Supreme Court found inadequate in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992). Even if the proposal were to be approved – it had not been at the time the Complaint was filed – Mr. Auster's alleged "injury" rests entirely on the unsupported conclusion that opening the Monument to commercial fishing "eliminates" his ability to continue his research.

Complaint does not allege that Dr. Auster's research must be conducted in the small fraction of the Monument where commercial fishing occurred before the Monument was designated in 2016, or that any commercial fishing is or will be occurring if and when he returns to the Monument.  The Complaint acknowledges that Dr. Auster has conducted research "over the past 35 years."  Compl. ¶ 139.  During most of that time, however, commercial fishing was permitted within the area now covered by the Monument.  Moreover, the allegations of harm allegedly caused by commercial fishing reference only "bottom trawling and off-shore pot fisheries."  *Id.* ¶ 140.  But red crab and lobster fishing – which use such bottom-tending gear – were allowed to continue even under the 2016 Proclamation, and they did not "eliminate" Dr. Auster's research. Finally, the Complaint fails to acknowledge the anticipated New England Fisheries Rule, or the other commercial fishing restrictions within the Monument.  In sum, the Complaint fails to allege concrete facts showing how the resumption of commercial fishing will now preclude Dr. Auster's research.  His alleged injuries are simply general conclusions unsupported by any particularized facts.  Taken together, they show nothing more than hypothetical and implausible future injuries, and therefore are insufficient to establish standing.

The Brookline Bird Club's alleged injuries are even more speculative.  The club organizes bird-watching trips to areas "inside the Monument and its vicinity to observe offshore seabirds."  Compl. 143.  Without citation of a single supporting fact – much less concrete and particularized facts – the Complaint asserts that opening the Monument to commercial fishing "will diminish interest" in birdwatching trips, which "will harm" the Bird Club's ability to observe seabirds.  *Id.*  Like the allegations relating to Dr. Auster, the Bird Club's injury allegations rest on the implausible, unsupportable assumption that commercial fishing is

19

occurring throughout the Monument and fails to include facts showing that any alleged conjectural harm is certain to occur or imminent.

NRDC's standing allegations, like CLF's, are also conjectural and contrary to known facts. NRDC bases standing on its member, marine biologist Dr. Scott Kraus. He has allegedly conducted aerial surveys and directed a research team "collecting data within the Monument boundaries" for the New England Aquarium. Although now retired, he "is involved in efforts to collect and analyze marine mammal data" from the northwest Atlantic, including the Monument, for the North Atlantic Right Whale Consortium. Compl. ¶¶ 147-152. But NRDC's allegations of injury stemming from the 2020 Proclamation are neither concrete nor particularized. NRDC provides no factual support for the conclusion that commercial fishing will "impair" or "compromise" any research Dr. Kraus might undertake within the Monument. NRDC's allegations also rest on the unsupported notion that commercial fishing will blanket the entire Monument. As discussed above, historic records of commercial fishing activity prior to the Monument's designation demonstrate the implausibility of that conclusion. Moreover, contrary to NRDC's allegation that the Monument is the only "area fully protected from commercial fishing in the U.S. Atlantic," (Compl. ¶ 150), even under the 2016 Proclamation, commercial fishing for lobster and red crab was allowed within the Monument; that exemption was to continue until 2023. And prior to 2016, the Monument area was fully open to commercial fishing. Although the Complaint refers generally to research Dr. Kraus will purportedly be unable to conduct with the resumption of commercial fishing, it fails to include any factual allegations establishing that Dr. Kraus is currently conducting such research or has any concrete plans to do so – such as commissioning a boat, or obtaining a grant. Thus, no alleged "compromise" of his research is imminent. Compl. ¶¶ 151-152. Indeed, the Complaint alleges

that all research trips have been put on hold due to the pandemic.  *Id.* at ¶ 149. In *Lujan*, the

plaintiff had no current plans to return to Sri Lanka because of a civil war. The Supreme Court

held that: "Such 'some day' intentions—without any description of concrete plans, or indeed

even any specification of *when* the some day will be—do not support a finding of the "actual or

imminent" injury" required to establish standing.  *Lujan,* 504 U.S. at 564. The same result should

be reached here.

    Plaintiff Zack Klyver also fails to allege facts establishing a concrete and imminent injury

stemming from the 2020 Proclamation.  His sole current connection to the Monument is that he

"uses the waters of the northwest Atlantic" to view and study marine wildlife "including some

that periodically use the Monument."  Compl. ¶ 153.  The waters of the northwest Atlantic are

far more expansive than the Seamounts Monument. Indeed, to date, Mr. Kylver has never visited

the Monument. As to his future plans, the Complaint includes only the vague, conclusory

allegation that he is working with unidentified "teams planning research trips to the Monument

in 2020 and 2021. . . to observe and study marine animals protected there."  *Id.* at ¶ 154.  Again,

such vague allegations, unsupported by concrete facts, are insufficient to support a finding of the

actual or imminent injury required to establish standing. *Lujan*, 504 U.S. at 564.  Moreover, even

under the 2016 Proclamation, lobster and red crab fishing have been occurring and would

continue to be permissible.  And like the Plaintiff organizations discussed above, Mr. Klyver

fails to allege facts showing how lifting the ban on commercial fishing (other than lobster and

red crab) will certainly and imminently impair his ability to observe and study marine animals

who pass through the Monument.

    Finally, CBR bases standing on its member, Dr. Carl Safina, a "marine ecologist and

writer" who is a recreational fisherman.  Compl. ¶¶ 158-159.  Dr. Safina allegedly takes seasonal

fishing trips to the "edge of the continental shelf," but does not allege that he has actually fished within the Monument.  Although he alleges that "it is now much harder to catch sharks, tuna and swordfish" than it was decades ago, any such difficulties could not be attributable to the June, 2020 Proclamation.  Dr. Safina does not allege that he has taken any recreational fishing trips to the Monument since it became effective.  Dr. Safina also attempts to assert standing based on anticipated alleged deprivation of information from others studying the Monument area.  As explained above, such derivative, speculative and conclusory allegations fall far short of what is necessary to establish standing.

Plaintiffs' general allegations of injury stemming from the 2020 Proclamation (Compl. ¶¶ 165-168) simply repeat the same conjectural purported injuries discussed above.  The allegations identify no actual, concrete or imminent injuries traceable to Proclamation 10049.  Rather, the Complaint simply alleges that a variety of harms "will likely result" from commercial fishing – other than red crab and lobster fishing.  *Id.* ¶¶ 165-166.  The allegation that commercial fishing in the Monument will interfere with scientific investigations "by harming and potentially extirpating species there that have yet to be identified" is entirely speculative --unsupported by any factual allegations.  *Id.* ¶ 167.  As explained above, the assertion that commercial fishing will "make it impossible" for Plaintiffs to use the Monument as a control and reference for studies of the Northwest Atlantic Ocean is both hypothetical and implausible.  Plaintiffs allege no facts showing that such studies are being conducted, have been funded, or that they could not continue in the vast majority of the Monument where commercial fishing never took place, and which will be protected by, *inter alia*, the New England Deep Sea Coral Amendment and other laws and regulations. Plaintiffs' assertion that the supposed harms are "likely to occur imminently" rests entirely on alleged statements by commercial fishing associations that "their members used to

fish commercially in the Monument area," *i.e.*, not in the Monument itself.  *Id.* ¶ 169.  These unnamed commercial fishing associations have allegedly stated an intention to resume fishing upon the lifting of the commercial fishing ban, but the Complaint includes no factual allegations showing that commercial fishing is now taking place, the extent or location of any current or anticipated fishing, or how it will eliminate Plaintiffs' ability to visit and/or conduct research within the Monument.  Plaintiffs' conclusory allegations are insufficient to demonstrate standing.  Because the Complaint fails to plausibly allege any concrete, imminent injury to Plaintiffs' members, it fails to satisfy their burden of establishing standing and should be dismissed.

**B.      Plaintiffs' Claims Against the President are Not Redressable.**

Plaintiffs assert three claims against the President, for which they seek declaratory and injunctive relief.  Yet Plaintiffs have not shown that entry of their requested declaratory and injunctive relief against the President would redress their injuries, or that the Court can properly award such relief against countervailing separation of powers concerns.  *See, e.g.*, *Franklin v. Massachusetts,* 505 U.S. 788, (1992) (reversing injunction entered against the President because "in general this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties" and because the alleged injury was likely to be redressed by declaratory relief against the Secretary of Commerce);  *Swan*, 100 F.3d at 977 n.1 (noting that an injunction against the President would present separation of powers concerns and "similar considerations regarding a court's power to issue relief against the President himself appl[ied] to [the plaintiff's] request for a declaratory judgment"); *Newdow v. Bush*, 391 F. Supp. 2d 95, 106-107 (D.D.C. 2005) (dismissing suit to enjoin President from presenting prayers at inauguration in part because court was "without the authority" to enter declaratory or injunctive relief against the President); *Barnett v. Obama*, No. SACV09-0082 DOC (ANX), 2009 WL 3861788, at *11 (C.D. Cal. Oct. 29, 2009) (dismissing suit to declare President ineligible for office because court could not enter

declaratory or injunctive relief against the President), *aff'd* 664 F.3d 774 (9th Cir. 2011).  Thus, even if Plaintiffs had articulated injury in fact, their injuries would not be redressable by remedies against the President, and for that additional reason Plaintiffs lack standing to pursue their claims against him.

## II.    The Antiquities Act Grants the President Broad Discretion Which Congress has Not Acted to Limit.

### A.    The Text and Legislative History of the Antiquities Act Authorize the President to Limit Monument Protections to Those Necessary to Protect Covered Resources.

Presidential authority to act "must stem either from an act of Congress or from the Constitution itself."  *Medellin v. Texas*, 552 U.S. 491, 524 (2008) (citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952); *Dames & Moore v. Regan*, 453 U.S. 654, 668 (1981)).  On multiple occasions, the Supreme Court has confirmed that the Antiquities Act delegates "broad power" to the President to designate national monuments and reserve lands for those monuments.  *See Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1135 (D.C. Cir. 2002) (citing *United States v. California*, 436 U.S. 32 (1978); *Cappaert v. United States*, 426 U.S. 128 (1976); *Cameron v. United States*, 252 U.S. 450 (1920)).  The statute grants the President substantial flexibility, expressly leaving the declaration of a monument to the President's "discretion."  54 U.S.C. § 320301(a).  Similarly, the decision to reserve lands for a monument is entirely discretionary.  *See id.* § 320301(b) ("The President *may* reserve parcels of land. . . .") (emphasis added)).

The Antiquities Act also provides an instruction to the President.  If lands are reserved for a monument, "[t]he limits of the parcels shall be confined to the smallest area compatible with the proper care and management of the objects to be protected."  *Id.*  In contrast to the discretionary language used in the rest of the statute, Congress used strong and mandatory

terms—"shall be confined"—to limit the area of lands reserved for a monument. *See Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1977 (2016) ("When a statute distinguishes between 'may' and 'shall,' it is generally clear that 'shall' imposes a mandatory duty."). Congress could not have been more clear that Presidents are to ensure that monument reservations are "confined" to the smallest area the President deems to be consistent with proper care and management of the protected resources. To conclude that the statute precludes the President from adjusting the activities prohibited within the Monument – while maintaining its boundaries – would be anomalous and contrary to both the Act's language and legislative history.

The legislative history of the Antiquities Act consistently emphasized the importance of limiting the reach of monument reservations. *See* H.R. Rep. No. 59-2224, at 1 (Antiquities Act intended "to create small reservations reserving *only so much land* as may be *absolutely necessary* for the preservation of those interesting relics of prehistoric times" (emphases added)); 40 Cong. Rec. 7888 (colloquy between Rep. John Stephens and Rep. John Lacey noting that "[n]ot very much" land will be withdrawn under the Antiquities Act because of the "smallest area necessary" provision). Indeed, Congress could have simply directed the President to "reserve" land in "*an* area compatible" with protection of monuments; its express instruction to "confine" the reservation to "*the*" area that is the "*smallest*" compatible with protection must be given significant weight.

The compulsory instruction from Congress to "confine" monument reservations to the smallest area necessary for the proper care and management of the designated objects cannot reasonably be construed to exclude authority to modify restrictions and prohibitions within a monument that the President finds more stringent than necessary to protect those objects. The

President cannot fully comply with Congress' instruction to ensure that monument reservations remain "confined" to those necessary for the proper management without the power to revisit prior reservations.  It is a well-settled principle that government entities have broad authority to reconsider decisions and correct errors.  *See, e.g.*, *Albertson v. FCC*, 182 F.2d 397, 399 (D.C. Cir. 1950) ("The power to reconsider is inherent in the power to decide."); *Sierra Club v. Antwerp*, 560 F. Supp. 2d 21, 23 (D.D.C. 2008) (same).  And Congress clearly understood that initial reservations of land might require revision, based on new understandings as to what the "smallest areas compatible" should comprise.  *See* H.R. Rep. No. 59-2224, at 3 (noting some monument designations "should be temporarily withdrawn and allowed to revert to the public domain after the ruins thereon have been examined by competent authority"); *see also id.*  at 7-8 (stating that "the permanent withdrawal of [lands]" would be "unnecessary except where the ruins are of such character and extent to warrant the creation of permanent national parks.").

Plaintiffs' Complaint is premised on the notion that the President's authority to designate monuments is, in effect, a one-way ratchet—that is, a President can reserve land and specify the restrictions necessary to protect its resources, but cannot later determine that some of those lands or prohibitions are not necessary for protection of the designated objects.  Plaintiffs purport to find that restriction in the grant of authority to "designate"[8] and "reserve."  *See, e.g.*, Compl. ¶ 175.  But courts must "follow the cardinal rule that a statute is to be read as a whole . . . since

---

[8] The term "designate" does not appear in the Antiquities Act. Rather, § 320301(a) provides that: "The President may, in the President's discretion, declare by public proclamation historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated on land owned or controlled by the Federal Government to be national monuments." 54 U.S.C. §320301(a).

the meaning of statutory language, plain or not, depends on context." *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991). Here, the "smallest area" for proper care and management requirement shows that, where it wanted to limit the President's authority, Congress did so expressly—in clear, precise, and mandatory terms. Given this context, it would be inconsistent to find that Congress meant to imply a one-way-ratchet restriction of equal or greater significance through its use of the terms "declare" and "reserve." The term "declare" simply authorizes the President "to make known by language" his declaration of a monument; it does not constrain his authority to manage the reservation to comply with the statutory command. *See* Webster's International Dictionary, at 377.

Put simply, a President cannot comply with the statutory instruction to ensure that the reserved lands are "confined to the smallest area" necessary to protect the objects if he can never remove lands from a monument reservation. By the same token, a President cannot ensure that monument restrictions are necessary for the protection of its designated resources if he is powerless to modify restrictions in ways that alter a monument's management. The Antiquities Act grants the President this authority.

**B.      There Is a Longstanding and Extensive History of Presidential Modification of Monument Boundaries, and Congressional Acquiescence in this Practice.**

Although the text, purpose, and history of the reservation provision amply demonstrate that modification of monuments is within the scope of the President's delegated authority, that conclusion is cemented by: (1) nearly a century of Presidential practice in modifying monument designations; and (2) congressional acquiescence in that practice despite numerous opportunities to curtail it. Monument modifications have most often involved changing boundaries—and not scaling back restrictions within a monument— but there is no reason to believe Congress would

27

acquiesce in the greater change (removing land from the monument's protections), but not permit the lesser (dropping unneeded or superfluous restrictions within a monument).

When the elected branches of government are in accord on the meaning of a statute, courts are properly reluctant to intervene.  "The longstanding 'practice of the government' can inform [a court's] determination of 'what the law is.'"  *N.L.R.B. v. Noel Canning*, 573 U.S. 513, 525 (2014) (quoting *McCulloch v. Maryland*, 4 Wheat 316, 401 (1819), and *Marbury v. Madison*, 1 Cranch 137, 177 (1803)).  Thus, courts afford a presumption of congressional consent to presidential action that is "known to and acquiesced in by Congress" over an extended period of time.  *United States v. Midwest Oil Co.*, 236 U.S. 459, 474 (1915); *Dames & Moore*, 453 U.S. at 686 (same).  *See also Medellin*, 552 U.S. at 524 ("Presidential authority can derive support from 'congressional inertia, indifference or quiescence.'" (quoting *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring))); *Al-Bihani v. Obama*, 619 F.3d 1, 26 (D.C. Cir. 2010) (Kavanaugh, J., concurring) ("courts presume that Congress authorized the President, except to the extent otherwise prohibited by the Constitution or statutes, to take at least those actions that U.S. Presidents historically have taken. . . .").

Here, the extensive history of presidential modification of monument boundaries, and Congressional acquiescence, corroborates the authority to make such modifications.  First, as described above, Presidents have modified prior Presidents' monument reservations—including by reducing them—since the statute's earliest days.  Only five years after passage, President Taft diminished the Petrified Forest National Monument based on his determination that it reserves "a much larger area of land than is necessary to protect the objects for which the Monument was created, and therefore the same should be reduced in area to confirm to the requirement of the act authorizing the creation of National Monuments."  Proclamation No. 1167, 37 Stat. 1716 (July

31, 1911); *see also* Proclamation No. 1186, 37 Stat. 1733 (Mar. 14, 1912) (diminishing Navajo

National Monument in Arizona because it reserved a larger tract of land than is necessary).  And

in numerous other instances Presidents reduced monuments in order to comply with the statutory

requirement that reservations be confined to the smallest area necessary.[9]  *See, e.g.*, Proclamation

No. 2393, 54 Stat. 2692 (Apr. 4, 1940; Proclamation No. 3539, 77 Stat. 1006 (May 27, 1963).

This practice is entirely consistent with Congress' expectation that subsequent study of

monument objects might necessitate a change to monument boundaries.  *See supra* pp.3-4

(quoting Hewett report).  Since enactment of the Antiquities Act, Presidents have eliminated

lands from Monuments in at least *eighteen instances*.  *See supra* p. 7 n.4.

Presidents have also cited other rationales as the basis for monument reduction.  President

Truman excluded lands from Santa Rosa National Monument because those lands were "needed

by the War Department for military purposes."  Proclamation No. 2659, 59 Stat. 877 (Aug. 13,

1945); *see also* Proclamation No. 3089, 69 Stat. c27 (Mar. 31, 1955) (elimination by President

Eisenhower of some lands from Glacier Bay National Monument that were "being used as an

airfield for national-defense purposes and are no longer suitable for national-monument

purposes"); Proclamation No. 2454, 55 Stat. 1608 (Jan. 2, 1941) (reduction of Wupatki National

Monument by President Franklin Roosevelt, noting that "such lands are needed in the

construction and operation of a diversion dam in Little Colorado River to facilitate the irrigation

of lands on the Navajo Indian Reservation"); Proclamation No. 2295, 53 Stat. 2465 (Aug. 29,

---

[9] As noted above, Presidents exercised their authority to reduce monuments based on other
reasons not specifically cited in the statute.  *See supra* pp. 6-7.  Furthermore, the modification
authority works both ways—Presidents have also determined that *additional* lands are required
for the protection of the original objects identified in a proclamation, based on new information
or circumstances. *Supra* p.7, n.3.

1938) (reduction by President Franklin Roosevelt of White Sands National Monument to allow

for U.S. Highway 70).

In some cases, Presidents even reduced monument reservations without providing any

explanation at all.  For example, Mount Olympus National Monument (now Olympic National

Park) was diminished—on three separate occasions by three different Presidents—without any

reason cited in the proclamations.  *See* Proclamation No. 1191, 37 Stat. 1737 (Apr. 17, 1912)

(President Taft); Proclamation No. 1293, 39 Stat. 1726 (May 11, 1915) (President Wilson);

Proclamation No. 1862, 45 Stat. 2984 (Jan. 7, 1929) (President Coolidge).

In the face of this longstanding presidential practice of reducing, enhancing, or otherwise

modifying monument boundaries, Congress has never revoked the delegated authority provided

by the Antiquities Act, despite opportunities to do so.  This is significant.  Congress's knowledge

of the presidential modification of monuments cannot be disputed.  Indeed, Congress has

involved itself in the establishment and disestablishment of monuments, including several

monuments that were modified by Presidents.  For example, Congress created Olympic National

Park, abolishing Mount Olympus National Monument, in 1938, but only after several Presidents

had altered the Monument's boundaries.  *See* Act of June 29, 1938, c. 812 §1, 52 Stat. 1241

(codified at 16 U.S.C. § 251); *see also* Act of Nov. 12, 1971, Pub. L. No. 92-155, 85 Stat. 422

(codified at 16 U.S.C. § 272) (abolishing Arches National Monument and creating Arches

National Park); Act of Feb. 26, 1919, Pub. L. No. 65-277, §§ 1, 9, 40 Stat. 1175, 1178 (codified

at 16 U.S.C. § 221) (redesignating Grand Canyon National Monument as national park).

Next, Congress has amended the Antiquities Act and expressly addressed Executive

Branch withdrawal authority in the Federal Land Policy and Management Act of 1976

("FLPMA"), but it has never revoked or reduced the President's asserted authority to modify

30

monuments.  Specifically, Congress amended the Antiquities Act in 1950 to bar any "further extension or establishment of national parks or monuments in Wyoming" without express authorization of Congress.  Pub. L. No. 81-787, § 1, 64 Stat. 849 (1950).  And Congress declined another opportunity to modify presidential authority in the 1970s, when it conducted a comprehensive review and revision of federal public lands policy.  That review focused particularly on land-withdrawal authority, and culminated in the 1976 enactment of FLPMA.

FLPMA declared it to be national policy that "Congress exercise its constitutional authority to withdraw or otherwise designate or dedicate Federal lands for specified purposes and that Congress delineate the extent to which the Executive may withdraw lands without legislative action."  43 U.S.C. § 1701(a)(4).  But, despite this stated focus, FLPMA did not alter presidential authority under the Antiquities Act.  In contrast, Congress *did* limit the Secretary of the Interior's authority, stating that the "Secretary of the Interior shall not . . . modify or revoke any withdrawal creating national monuments" under the Antiquities Act.  *See* 43 U.S.C. § 1714(j). Under the interpretive canon "*expressio unius est exclusion alterius*,"—"expressing one item of [an] associated group or series excludes another left unmentioned"—Congress' decision not to address Presidential modification authority is compelling evidence of congressional acquiescence to Presidential authority to modify and manage existing monuments.  *N.L.R.B. v. SW General, Inc.*, 137 S. Ct. 929, 940 (2017) (citation omitted); *see also Dames & Moore*, 453 U.S. at 686.  This "longstanding 'practice of the government'" therefore decidedly corroborates the President's authority under the Act to modify applicable restrictions within lands reserved as monuments. *See Noel Canning*, 573 U.S. at 525 (citation omitted).

31

**C.      The Supreme Court Has Approved Management Actions Modifying Monument Protections.**

In *Cappaert,* the Supreme Court unanimously held that both a subterranean pool in the Devil's Hole National Monument and the pool's "rare inhabitants" – the desert pupfish, for which the pool is the sole known habitat – were objects of scientific or historic interest within the meaning of the Antiquities Act.  426 U.S. at 141-42.  In the same opinion, the Court also considered whether monument protections may be modified in ways that are compatible with the proper care and management of the resources to be protected.  When a neighboring rancher's pumping of groundwater from the vicinity of the pool lowered its water level to a point that threatened the pupfish's survival, the United States Fish and Wildlife Service obtained an injunction prohibiting pumping to the extent it lowered the water level below that necessary to protect the pool and the fish.  The Supreme Court held that the injunction was properly crafted:

> The pool need only be preserved, consistent with the intention expressed in the Proclamation, to the extent necessary to preserve its scientific interest. The fish are one of the features of scientific interest. . . .  [T]he level of the pool may be permitted to drop to the extent that the drop does not impair the scientific value of the pool as the natural habitat of the species sought to be preserved. The District Court thus tailored its injunction, very appropriately, to minimal need, curtailing pumping only to the extent necessary to preserve an adequate water level at Devil's Hole, thus implementing the stated objectives of the Proclamation.

*Id.* at 141.

*Cappaert* demonstrates that monument restrictions are not etched in stone and static. Management of a monument can properly include modification of its protections, so long as those modifications are "compatible with the proper care and management of the objects to be protected."  54 U.S.C. § 320301(b).  It cannot reasonably be concluded that an executive agency managing a monument may modify its restrictions (by seeking and obtaining a limited injunction) so long as it adheres to Monument objectives, but the President, who has discretion to create Monuments and determine the scope of appropriate protections in the first instance, lacks

such authority.  Here, the President acted within the scope of his authority in concluding that "appropriately managed commercial fishing would not put the objects of scientific and historical interest that the monument protects at risk."  85 Fed. Reg. at 35,793.

## III.    Plaintiffs' *Ultra Vires* Claims Fail as a Matter of Law.

Even if the Court should determine it has Article III jurisdiction over Plaintiffs' *ultra vires* claims as to any defendant, it should dismiss those claims pursuant to Rule 12(b)(6). Plaintiffs assert that the President lacked the authority to issue the Proclamation.  To the contrary, the President possesses broad discretion under the Antiquities Act to modify reservations of land for national monuments and to confine the reservation to the "smallest area compatible with the proper care and management of the objects to be protected."  54 U.S.C. § 320301(b).  Ensuring that monument prohibitions do not exceed those the President determines to be necessary to protect designated objects is an inherent component of the President's authority under the Act.

### A.    Judicial Review of Presidential Monument Designations Is Extremely Limited.

Where the President acts pursuant to a delegation of authority from Congress, the scope of judicial review of that decision-making is extremely limited.  This longstanding rule derives from concerns about separation of powers and the potential involvement of the judiciary in "considerations which are beyond the reach of judicial power."  *Dakota Cent. Tel. Co. v. South Dakota*, 250 U.S. 163, 184 (1919); *see also Dalton v. Specter*, 511 U.S. 462, 476 (1994) ("How the President chooses to exercise the discretion Congress has granted him is not a matter for our review."); *United States v. George S. Bush & Co.*, 310 U.S. 371, 380 (1940) ("For the judiciary to probe the reasoning which underlies this Proclamation would amount to a clear invasion of the legislative and executive domains.").

In *Massachusetts Lobstermen*, the District of Columbia Circuit explained the framework for judicial review of presidential action under the Antiquities Act.  945 F.3d at 540.  The court distinguished two types of claims: those justiciable on the face of the proclamation and those requiring factual development.  Claims justiciable on the face of the proclamation are resolved as a matter of law "because they turn on questions of statutory interpretation."  *Id.*  Judicial review of such claims is available "to ensure that the Proclamations are consistent with constitutional principles and that the President has not exceeded his statutory authority." *Mass. Lobstermen's Ass'n v. Ross*, 349 F. Supp. 3d 48, 54 (D.D.C. 2018).  The court acknowledged that, for claims requiring factual development, "the precise 'scope of judicial review' remains an open question." 945 F.3d at 540 (citation omitted).  However, to survive a motion to dismiss, "at a minimum, plaintiffs' pleadings must contain plausible factual allegations identifying an aspect of the designation that exceeds the President's statutory authority."  *Id.*  Applying these principles, the court affirmed the dismissal of a complaint challenging the President's designation of the Northeast Canyons and Seamounts Marine National Monument.  It rejected, as a matter of law, Plaintiffs' claims that: (1) the monument is not "land" within the meaning of the Antiquities Act; (2) its designation is incompatible with the Sanctuaries Act; and (3) the EEZ is not "controlled" by the federal government.  The court also held that plaintiffs' allegations that the monument is not the smallest area compatible with management of its resources were insufficient to state a claim under the Antiquities Act because they included no supporting facts. *Mass. Lobstermen,* at 544.  *See also Mountain States*, 306 F.3d at 1136;  *Tulare Cnty. v. Bush*, 306 F.3d 1138, 1141-42 (D.C. Cir. 2002) (rejecting claims that monument proclamation was *ultra vires* based on alleged failure "to include a certain level of detail," designation of "nonqualifying objects," and failure to comply with the "smallest area compatible" requirement).

**B.      The President Acted Within the Scope of His Authority in Issuing the Proclamation.**

Judicial review of Count I of the Complaint is limited to determining whether the President, on the face of the Proclamation, exercised his authority in accordance with the Act's standard.  *See Tulare*, 306 F.3d at 1141 (addressing whether challenged proclamation "adverts to the statutory standard."); *Mountain States*, 306 F.3d at 1137 (noting that proclamation "recites grounds for the designation that comport with the Act's policies and requirements"); *UAC*, 316 F. Supp. 2d at 1183 (judicial review "is at best limited to ascertaining that the President in fact invoked his powers under the Antiquities Act").  Indeed, the separation of powers concerns inherent in review of discretionary presidential action may "bar review for abuse of discretion altogether."  *Mountain States*, 306 F.3d at 1135; *see also UAC*, 316 F. Supp. 2d at 1183 ("When the President is given such a broad grant of discretion as in the Antiquities Act, the courts have no authority to determine whether the President abused his discretion." (citing *Bush*, 310 U.S. 371)).

Courts may not, for example, second-guess "[h]ow the President chooses to exercise . . . discretion [that] Congress has granted him."  *Mountain States*, 306 F.3d at 1136 (quoting *Dalton*, 511 U.S. at 476 (alteration added)).  Rather, when presented with a legal challenge to a Presidential Proclamation, the court's job is to "ensure that the Proclamation[ ] [is] consistent with constitutional principles and that the President has not exceeded his statutory authority." *Mountain States, 306 F.3d at 1136.*

Proclamation 10049 fully satisfies the applicable standard.  It repeatedly "adverts to the statutory standard" for designating monument objects and reserving monument lands, *Tulare* 306 F.3d at 1141, and it "recites grounds for" modification of the commercial fishing prohibition that "comport with the Act's policies and requirements," *Mountain States*, 306 F.3d at 1137.

35

Specifically, without altering the area covered by the Monument, Proclamation 10049 modifies its protections to implement only those the President found necessary for proper care and management:

> After further consideration of the nature of the objects identified in Proclamation 9496 and the protection of those objects already provided by Magnuson-Stevens and other relevant law, I find that a prohibition on commercial fishing is not, at this time, necessary for the proper care and management of the Northeast Canyons and Seamounts Marines National Monument, or the objects of historic or scientific interest therein.

85 Fed. Reg. at 35,794.

The Antiquities Act explicitly directs the President to ensure that the area reserved for a monument is "confined to the smallest area" necessary to protect its identified resources. Given that admonition, the Act cannot reasonably be read to limit the President's discretion to otherwise modify monument protections and management practices to ensure that they too are "compatible with the proper care and management of the objects to be protected." 54 U.S.C. § 320301(b). The President's exercised authority comports with the statute's broad grant of discretion in declaring and managing national monuments. This "compel[s] a finding in favor of the President's action [which is] essentially the end of the legal analysis." *UAC*, 316 F. Supp. 2d at 1183. Accordingly, because no further inquiry is appropriate, Count I of the Complaint should be dismissed or failure to state a claim.

## IV.   Plaintiffs' Allegations that the Proclamation Violated the Constitution Fail to State a Claim.

In Count Two, Plaintiffs repackage their *ultra vires* claims as constitutional claims, invoking separation of powers principles. These claims also fail outright. As established above, in the Antiquities Act, Congress delegated to the President authority to limit monuments to those areas necessary for the proper care and management of its designated objects. Since the expressed purpose of §320301(b) of the Act is to ensure that monument prohibitions extend no

36

further than necessary to protect their covered resources, the President's exercise of this authority does not violate any constitutional principle.  Furthermore, Plaintiffs' attempts to restate their *ultra vires* arguments as constitutional claims violates the Supreme Court's admonition that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims, subject to judicial review. . . ."  *Dalton*, 511 U.S. at 473.

Although Plaintiffs' constitutional claim can be properly disposed of on this basis, it fails for additional reasons.  Plaintiffs' separation of powers claim alleges that the President improperly exercised legislative authority by confining monument protections to those necessary to safeguard its resources.  But, where a statute authorizes executive branch action and "lay[s] down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform," there is no constitutional concern.  *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472-73 (2001) (citation omitted).  The "intelligible principles" standard is clearly met here, where Congress has instructed the President to confine monument reservations to the "smallest area compatible" with protection of the objects.  *See Mountain States*, 306 F.3d at 1136-37 (Antiquities Act "includes intelligible principles to guide the President's actions."); *Tulare*, 306 F.3d at 1143 (same).  And because Congress properly delegated its authority under the Property Clause to the President in the Antiquities Act, and the President exercised this authority in issuing the Proclamation, there is no separation of powers concern or violation of the Property Clause here.  *See Mountain States*, 306 F.3d at 1136-37 (rejecting Property Clause claim); *UAC*, 316 F. Supp. 2d at 1184 (same).

Finally, Plaintiffs' allegations of constitutional violations would also fail *even if* the Court were to hold that the Proclamation somehow exceeded the delegation in the Antiquities Act.  The Proclamation makes clear that it was issued pursuant to the authority in the Antiquities Act and

that authority only.  *See* 85 Fed. Reg. 35,793, 35,793 (June 5, 2020).  Thus, if Plaintiffs were to

demonstrate that Proclamation was not authorized by the Antiquities Act, it would be

unnecessary for the Court to review Plaintiffs' constitutional claims.  No secondary authority has

been asserted by the President to support the Proclamation in the event the Antiquities Act is

held not to authorize it.

But, of course, as demonstrated above, the Antiquities Act *does* authorize the

Proclamation.  In short, Plaintiffs' *ultra vires* claims fail, and Plaintiffs' constitutional claims fail

with them.  The Court should accordingly dismiss Counts I and II of the Complaint.

## V.    Plaintiffs' Allegations that the Proclamation Violates the Antiquities Act Fail to State a Claim.

Count III of the Complaint alleges that the 2020 Proclamation "lacks any adequate legal

or factual justification, and is inconsistent with the proper care and management of the objects to

be protected in the Monument."  Compl. ¶ 186.  However, it is settled law that "the judgment of

any public officer taking legislative action cannot be reviewed by the courts."  *Tulare Cnty. v.

Bush*, 185 F. Supp. 2d 18, 24 (D.D.C. 2001), *aff'd*, 306 F.3d 1138 (D.C. Cir. 2002).  In *United

States v. George S. Bush & Co.*, the Supreme Court reviewed the President's 1934 proclamation

increasing the duty on canned clams imported from Japan, pursuant to the Tariff Act.  The Court

explained that probing the reasoning underlying the President's issuance of the proclamation

would be an invasion of the legislative and executive domains:

> It has long been held that where Congress has authorized a public officer to take
> some specified legislative action when in his judgment that action is necessary or
> appropriate to carry out the policy of Congress, the judgment of the officer as to the
> existence of the facts calling for that action is not subject to review.

*United States v. George S. Bush & Co.*, 310 U.S. 371, 379–80 (1940).

Based on the above reasoning, in *Tulare County*—an action challenging President Clinton's designation of a national forest as a monument—this Court held that it could only review whether the President's exercise of discretion complied with the Antiquities Act. "[T]his court cannot review the President's determinations and factual findings." *Tulare,* 185 F. Supp. 2d at 25.

Count III of the Complaint asks the Court to probe the factual basis for the President's conclusion that a ban on commercial fishing is not, at this time, necessary for the protection of Monument resources. But, as in *Tulare*, the Court cannot second-guess the President's factual findings. Because the President has authority under the Antiquities Act to modify Monument restrictions, this Court's inquiry is at an end.

Furthermore, even if further judicial review were available, Count III would fail to state a claim for which relief can be granted because it includes no "plausible factual allegations identifying an aspect of the designation that exceeds the President's statutory authority." *Mass. Lobstermen's Ass'n*, 945 F.3d at 540 (citation omitted). To obtain judicial review of factual claims -- for instance, as to the size of a monument -- a complaint must include "specific, nonconclusory factual allegations establishing a problem with its boundaries." *Mass. Lobstermen's Ass'n*, 349 F. Supp. 3d at 67. Under the above construct, to obtain judicial review of the claim that a commercial fishing ban is essential for the proper care and management of the Monument's protected resources, the Complaint must include specific, nonconclusory factual allegations establishing that commercial fishing within the Monument is incompatible with proper protection of its resources. It does not.

Rather, the Complaint contains only general, conclusory allegations, devoid of particularized factual support. Paragraph 91's allegation that the Proclamation's commercial

fishing prohibition "was essential to the proper care and management of the objects of the Monument," is supported only by general allegations which are not specific to the Monument. For example, Paragraph 55 includes allegations about commercial fishing gears historically used "in this area," but does not allege that such gear was used within the Monument, and if so, where, when, or to what extent.  The Complaint also fails to include facts showing how and the extent to which any such use damaged Monument resources.  Similarly, Plaintiffs allege that a bottom trawl net can destroy living habitat, but nowhere allege that such equipment was used within the area covered by the Monument or destroyed Monument habitat.  Compl. ¶57.  The remaining allegations relating to commercial fishing are similarly general; they include no facts establishing that any such activities occurred within the Monument, damaged Monument resources in the past, or would do so in the future.  Compl. ¶¶ 58-63.

Plaintiffs' conclusory allegations do not satisfy the requirement that, to obtain judicial review of monument designations, a complaint must, at a minimum, include plausible factual allegations showing that the designation exceeds the President's statutory authority.  As the D.C. Circuit has noted, the Court "is necessarily sensitive to pleading requirements [when] . . . review[ing] the President's actions under a statute that confers very broad discretion," particularly where separation of powers concerns are also implicated.  *Mountain States,* 306 F.3d at 1137 (citing *Dalton,* 511 U.S. at 474–76; *Bush,* 310 U.S. at 380).  Because Plaintiffs have not alleged particularized facts plausibly establishing grounds for judicial review of the President's actions, Count III fails to state a claim for which relief can be granted and must be dismissed.

## VI.   Plaintiffs' APA Count Fails to State a Claim.

Under the APA, a court may set aside final agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2). Plaintiffs allege that Defendants Bernhardt, Ross, and Jacobs will act unlawfully by

implementing the Proclamation.  As demonstrated above, Plaintiffs have no standing to bring these claims.  Furthermore, Plaintiffs necessarily fail to state a claim on these APA counts because they are premised on Plaintiffs' allegations that the Proclamation is *ultra vires* or otherwise unlawful, and, as shown above, those allegations fail as a matter of law.  But even in the absence of these threshold defects, Plaintiffs' APA counts fail to state a claim and should be dismissed under Rule 12(b)(6).

### A.      Plaintiffs Fail to State a Claim under 5 U.S.C. § 706(2).

Plaintiffs' claims to set aside agency action under § 706(2) fail because the Complaint does not allege any final agency action by the Agency Defendants that is reviewable under the APA, 5 U.S.C. § 704.  Under the two-part test in *Bennett v. Spear*, 520 U.S. 154 (1997), an agency action is final if it "mark[s] the consummation of the agency's decisionmaking process" and is an action "by which rights or obligations have been determined, or from which legal consequences will flow."  *Id.* at 177-78 (internal quotation marks and citations omitted).  A cause of action exists under the APA only "when, and to the extent that, a specific 'final agency action' has an actual or immediately threatened effect."  *Lujan*, 497 U.S. at 894.

Plaintiffs have not alleged any "specific" final agency action by Defendants Bernhardt, Ross, and Jacobs.  *See Lujan*, 497 U.S. at 894.  Plaintiffs' general allegations do not describe any discrete agency action that "marked the consummation" of a decision-making process or "determine[d]" rights or obligations, *Bennett*, 520 U.S. at 177-178.  For example, Plaintiffs allege that "the Agency Defendants have decided no longer to enforce the 2016 Proclamation's prohibition on commercial fishing within the Monument," and "will not to carry out their duties . . . under the 2016 Proclamation," Compl. ¶¶ 190, 191.  However, it is well established that "an on-going program or policy is not, in itself, a final agency action," *Cobell v. Norton*, 240 F.3d 1081, 1095 (D.C. Cir. 2001) (quotation marks omitted), and "[g]eneral deficiencies in

41

compliance" with resource-protection obligations "lack the specificity" to support review under the APA. *Norton v. S. Utah Wilderness All.* ("*SUWA*"), 542 U.S. 55, 66 (2004). The APA does not provide a vehicle for "a broad programmatic attack" on agency management decisions. *Id.*

### B. Plaintiffs also Fail to State a Claim for an Order Compelling Agency Action under 5 U.S.C. § 706(1).

Alternatively, Plaintiffs' APA count seeks an order under 5 U.S.C. § 706(1) directing the agency Defendants "to carry out their mandatory duties imposed in the 2016 Proclamation." Compl., Prayer for Relief ¶ 3. Under *SUWA,* the type of "failure to act" that is remediable under § 706(1) is "limited . . . to a discrete action," such as "the failure to promulgate a rule or make some decision by a statutory deadline." 542 U.S. at 63. The action must also be "legally required," just as the historical remedy of mandamus "was normally limited to enforcement of a specific, unequivocal command." *Id.* (internal quotation marks and citation omitted). *See also Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 670 (D.C. Cir. 2016). Plaintiffs' claim fails to meet either of these elements.

Plaintiffs' request for an order compelling the Agency Defendants to comply with the general protective mandates embodied in the 2016 Proclamation seeks no discrete action. In *SUWA*, the Court expressly held that general "compliance" with protective mandates (in that case, from a statute) is not a discrete agency action the court could compel. *SUWA*, 542 U.S.. at 66. *See also El Paso Nat. Gas Co. v. United States*, 750 F.3d 863, 891 (D.C. Cir. 2014) (provision containing "only a general follow-the-law directive … flunks *SUWA*'s discreteness test"); *Ctr. for Biological Diversity v. Zinke*, 260 F. Supp. 3d 21, 27 (D.D.C. 2017) (finding regulation "far too general and amorphous to be the kind of agency action that can be enforced by a claim under § 706(1)").

Plaintiffs' claim also fails the "legally required" element of *SUWA*.  To the extent there are any inconsistencies between the 2016 and 2020 Proclamations, the 2020 Proclamation now controls.  Plaintiffs cite no source of law that specifically and unequivocally commands the Agency Defendants to act contrary to the provisions of that Proclamation.  Further, it is well settled that no general private cause of action exists to enforce obligations imposed on executive branch officials by executive orders.  Such cause of action exists only when the order's terms and purpose evidence the intent create a private right of action.  *See UAC*, 316 F. Supp. 2d at 1200.  Nothing in Proclamation 10049 evidences such an intent.

## CONCLUSION

Plaintiffs' Complaint should be dismissed in full for lack of Article III jurisdiction.  To the extent the Court concludes it has Article III jurisdiction, all counts should be dismissed for failure to state a claim. All counts against the President should be dismissed for failure to state a claim and separation of powers concerns.

Respectfully submitted this 31st day of August, 2020,

JEAN E. WILLIAMS
Deputy Assistant Attorney General

  */s/ Lucinda J. Bach*
LUCINDA J. BACH
Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 7611, Ben Franklin Station
Washington, D.C. 20044-7611
Phone:  202-616-9663
Fax:  202-305-0506
Email:  Lucinda.bach@usdoj.gov

Attorneys for Federal Defendants

43

**CERTIFICATE OF SERVICE**

I hereby certify that on August, 31, 2020, I electronically filed the foregoing document and its attachments with the Clerk of the Court using the CM/ECF system, which will send notification of the filing to all parties.

*/s/ Lucinda J. Bach*